**SERRER, ETC., Plaintiff-Appellant, v CIGARETTE SERVICE CO. ET AL., Defendant-Appellees.**

**SERRER, ETC., Plaintiff-Appellant, v PRICE ET AL., Defendant-Appellees.**

Ohio Appeals, Eighth District, Cuyahoga County.

Nos. 20449-20450.   Decided April 14th, 1947.

Jones, Day, Cockley & Reavis, Cleveland, for plaintiff-appellant.

Halle, Haber, Berick & McNulty, Cleveland, for defendant-appellees.

## OPINION

By MORGAN, J.:

These two cases were tried together and involve the same question.

In both cases the plaintiff alleged that defendants are wholesalers of cigarettes and are violating the "Unfair Cigarette Sales Act" (Secs. 6402-10 to 6402-21 GC). The specific violation charged is that defendants are selling cigarettes at less than the "cost to the wholesaler" as defined by §6402-11 GC with intent to injure competitors, destroy substantially or lessen competition.

The cases were heard in Common Pleas Court by his Honor, Judge McNamee, who refused the injunction on the ground that the "Unfair Cigarette Sales Act" is unconstitutional. Judge McNamee held that the definition of "Cost to the Wholesaler" as found in §6402-11 GC violates the "due process" and "equal protection of the law" provisions of the 14th Amendment to the Constitution of the United States, and **Art. I, Sec. 19 of the Ohio Constitution** "by divesting defendants of property rights inherent in the cash and carry method of doing business."

Judge McNamee prepared a closely reasoned opinion and this court in affirming the judgment might well rest the case on his opinion. However, in view of the issues submitted and the importance of the case, we have decided to make some additional observations.

"Cost to the wholesaler" is defined in §6402-11 (c) GC as follows:

"The term 'cost to the wholesaler' shall mean the invoice cost of the cigarettes to the wholesaler, or the replacement cost of the cigarettes to the wholesaler within thirty days prior to the date of sale, in the quantity last purchased, whichever is lower; less all trade discounts except customary discounts for cash; to which shall be added a wholesaler's mark-up to cover in part the cost of doing business, which wholesaler's mark-up, in the absence of proof of a lesser cost of doing business by the said wholesaler as evidenced by the standards and methods of accounting regularly employed by him in his allo-

cation of overhead costs and expenses, paid or incurred, including without limitation, labor, salaries of executives and officers, rent, depreciation, selling costs, maintenance of equipment, delivery, delivery costs, all types of licenses, taxes, insurance and advertising, shall be two per centum of said invoice cost of the cigarettes to the wholesaler, or of the replacement cost of the cigarettes to the wholesaler within thirty days prior to the date of sale in the quantity last purchased, whichever is lower, less all trade discounts except customary discounts for cash."

Sec. 6402-12 (a) GC provides as follows:

"It shall be unlawful for any retailer with intent to injure competitors, destroy substantially or lessen competition, to advertise, offer to sell or sell at retail, cigarettes at less than cost to the retailer, or any wholesaler, with intent to injure competitors, destroy substantially or lessen competition, to advertise, offer to sell or sell at wholesale cigarettes at less than cost to the wholesaler and such retailer or wholesaler shall be guilty of a misdemeanor and punishable, by a fine of not more than five hundred dollars."

Accordingly, the statutory formula for determining cost to the wholesaler is invoice price, less trade discount, plus two per cent mark-up, unless the wholesaler furnishes proof that he is doing business at a lesser cost.

Inasmuch as cigarettes are sold by the leading manufacturers to all wholesalers at a list price of $6.81 per thousand, less a ten per cent trade discount, the cost per carton of 200 cigarettes fixed by the statutory formula, plus tax, is $1.4403 per carton and is the same for all wholesalers. In these cases no one of the parties claimed or offered proof that their costs were less than $1.4403 per carton.

The plaintiff and other wholesalers are selling at a price of $1.45 per carton or a fraction less than one cent above the minimum price. The defendants since November 1, 1945, have been and are selling at the price of $1.42 per carton to their "cash and carry" customers. This is two cents and a fraction below the minimum price provided in the "Unfair Cigarette Sales Act."

The plaintiff is a "service" wholesaler and the defendants are "cash and carry" wholesalers. By "service wholesaler" is meant one who hires salesmen, advances credit and makes deliveries to customers. A "cash and carry wholesaler" does not render these services.

It is obvious that the additional services rendered by the "service" wholesaler increases his costs over a "cash and carry" wholesaler. The record shows that this increase amounts roughly to two cents per carton. It is the position of the defendants that they would not be in a competitive position with the plaintiff unless they are in a position to offer on their part some compensating advantages for their failure to render the services. The only compensating advantage is in a reduction in price.

For three years prior to November 1, 1945, all of the wholesalers in the Cleveland area, including the defendants, were selling cigarettes at the price of $1.45 per carton. During the war years the market for cigarettes was a seller's market and usually a plentiful supply could not be obtained at any price. Prior to the war these "cash and carry" wholesalers were pricing cigarettes from one to three cents per carton below "service" wholesalers.

Judge McNamee found that the plaintiff had established by proof that the defendants reduced their price from $1.45 to $1.42 per carton of cigarettes "with intent to injure competitors, destroy substantially and lessen competition." This finding was based principally on the evidence of J. G. Ollendorf, Secretary of The Ohio State Association of Tobacco Distributors, who testified to a conversation he had with the defendant, Price, in November, 1945, in which Price had referred to the sale by Serrer, the plaintiff, of some cigarette vending machines to a Mr. Golden and that Golden had purchased a wholesale distributing place on Woodland Avenue. Price stated that Golden was "a pup who had now grown to be a dog and he was not going to permit the dog to bite him." Although this conversation was in November, 1945, the incident referred to had occurred a number of years before.

While we accept the finding by Judge McNamee that the reduction by the defendant in November, 1945, of his price from $1.45 to $1.42 a carton was aimed at one of Price's competitors, the record shows that this was not the only reason and in fact not the principal reason for the price reduction. The plaintiff himself testified:

"Q. The fact is, of course, that in all your years of dealing in this business you had to compete with cash and carry wholesalers, especially Cigarette Service Company that does a cash and carry business, isn't that so?

"A. That is right.

"Q. And the cash and carry wholesaler can undersell you, isn't that a fact?

"A.  Yes.   Yes, I presume they could.

"Q.  He doesn't have to pay a salesman any share of profits?

"A.  That is right.

"Q.  Nor make any deliveries or collect or give credit?

"A.  No, sir.

"Q.  And you had to contend with that in your business, as a matter of general practice, for years?

"A.  Yes, sir."

The reasons assigned by defendant for reducing his price to $1.42 per carton in November, 1945, were (1) because the chain stores after V-J Day announced a cut to $1.50 per carton and defendant's customers asked for a cut in the wholesale price to enable them to meet this competition and (2) because service wholesalers offered delivery at $1.45 and retailers did not see a reason for wasting time and gasoline to come to defendant and pick up the merchandise for the same price.

J. G. Ollendorf above referred to, is Secretary of the Ohio State Association of Tobacco Distributors.  This is the official organization of the Tobacco Distributors, and is comparable to the one referred to in the case of **Rayess v Lane Drug Company, 138 Oh St 401**.  In this action there was an attempt to enforce a contract which the cigarette jobbers or wholesalers had entered into with retailers to fix the retail price for the sale of substantially all brands of cigarettes sold within the state.  The Supreme Court held that this contract was not permitted under the Ohio Fair Trade Act, §6402-2 **to 6402-9 GC**.  The purpose of that Act according to the court was to "allow the manufacturer or distributor of a commodity of standard quality bearing a trade mark, brand or name, to protect his particular property from being sold at indiscriminate prices.   Therefore, a contract to effect that purpose must be 'vertical in character and not horizontal.' * * * * Contracts of the latter type are price-fixing in effect and are forbidden by the statutes of this and other states."

It is a significant coincidence that the case of Rayess v Lane Drug Co, supra, was decided on June 25, 1941 and that the "Unfair Cigarette Sales Act" which is the basis of the action in the instant case was enacted on August 27, 1941, or two months and two days afterwards.

Sales Acts to prevent the sale of goods below cost, where sustained, have been sustained generally on the ground that such acts tend to prevent the creation of monopolies and to foster free, open and fair competition.   The effect of a decree

for plaintiff in this case would be to compel defendants to sell at not less than $1.4403 per carton or, to avoid fractions, at $1.45 per carton. In other words, a decree for plaintiff would compel the only wholesaler in this region which is selling below $1.45 per carton to desist and to join the procession. Thus, an act which can be defended only on the basis that it prevents monopoly and fosters competition is twisted to accomplish the direct opposite, namely, the sale of cigarettes at wholesale in Ohio at a uniform price.

This result is so at variance with the true purpose and intent of price control statutes that the plaintiff hesitates to support it with all its implications. The plaintiff in his reply brief states that there is nothing in the act which if properly construed would deny to a "cash and carry" wholesaler any overhead cash advantage which he may have over his competing "service" wholesalers. This construction would permit the defendants to sell at $1.43 per carton or two cents below the price of the "service" wholesaler. The plaintiff, however, was unwilling to take this position finally, because in the next sentence of his brief he returns to his original proposition "that the Act is still valid even if it be so construed as to deny to a cash and carry wholesaler his overhead cost advantage over competing service wholesalers." That is, plaintiff's position is that the Act is still valid even if the defendants under it would be required to sell at the price at which all of the members of the Ohio Association of Tobacco Distributors are now selling, namely, $1.45 per carton.

It is our opinion that under the statute, if it be held constitutional, defendants cannot sell below $1.4403 per carton.

Plaintiff bases his suggestion that the defendants might be able to sell at $1.43 per carton, on §6402-15 GC, which provides:

"Any retailer or wholesaler, may advertise, offer to sell, or sell cigarettes at a price made in good faith to meet the prices of a competitor, who is selling the same article at cost to him as a wholesaler or retailer."

This section permits a wholesaler "to meet the price of a competitor," but wipes out any cost advantage that cash and carry wholesalers would otherwise have and also denies to the public the benefit of a reduction in price amounting to substantially two cents per carton, by dealing with cash and carry wholesalers.

Judge McNamee's opinion on this point is quite pertinent.

"Concededly, a Cash and Carry Wholesaler's cost of doing business is less than that of a Service Wholesaler. This differential in cost enables a Cash and Carry Wholesaler, in the absence of statutory regulations, to undersell a Service Wholesaler who employs salesmen, delivers merchandise and extends credit. Where commodities of standard quality, such as leading brands of cigarettes, are the subject of competition, a Service Wholesaler relies upon the appeal of service for the procurement of business. His competitive advantage in this regard is equalized by a Cash and Carry Wholesaler's ability to sell at a lesser price. A regulatory statute which operates unfairly to disturb this balance is unreasonable and discriminatory. * * * Thus, higher cost service wholesalers are placed on a parity with low cost cash and carry wholesalers in the important matter of a legal minimum sales price. The natural competitive advantage resulting from lower prices, based upon lower costs, is destroyed."

The question under consideration was considered in the case of Florida Dry Cleaning & Laundry Board v Everglades Laundry Company, 188 So. 380 (Fla.) where the constitutionality of a Florida statute regulating the laundry business was under attack by certain cash and carry laundries. Under the Florida Act an administrative board was empowered to fix prices in the laundry business.

"There is a distinct difference between delivery and the cash and carry aspect of the laundry and dry cleaning business. The manner and cost of administration in each is materially different and those who prefer to patronize the cash and carry business are entitled to the advantage of this difference. In fixing a schedule of prices, it is the duty of the Board in the interest of the public to take into consideration these elements and establish a differential in charges between the two methods accordingly. If they fail in this, they may be required by the law as here quoted to do so."

In the Ohio "Unfair Cigarette Sales Act" no administrative board is created to determine costs, but costs are determined by the formula contained in the statute. The failure of the statute to take account of the fundamental differences between the cost of cash and carry wholesalers and wholesalers who

hire salesmen, extend credit and make deliveries, presents the same situation as would have been presented in the Florida case if the administrative board in its regulations of the laundry business in Florida had failed to take account of these important differences.

The law in respect to fixing minimum prices and preventing price cutting is in the process of development. In the case of Dr. Miles Medical Company v John D. Park & Sons Co., 220 U. S. 373, decided in 1911, the medical company attempted to establish minimum prices at which sales should be made by its vendees and by all subsequent purchasers. The court held that the attempt amounted to a restraint of trade and was invalid both at common law and so far as it affected interstate commerce under the Sherman Anti-Trust Act of July 2, 1890. The court said at page 408:

"But agreements or combinations between dealers having for their sole purpose the destruction of competition and the fixing of prices are injurious to the public interest and void."

Later in a number of states, laws were enacted comparable to the Ohio Fair Trade Act, §§6402-2 to 6402-9 incl. GC, giving owners of goods protected by a trade mark the right to fix resale prices of such commodities. The validity of the Illinois Act was challenged in the case of Old Dearborn Distributing Co. v Seagram Distilleries Corp., 299 U. S. 183 (1936) and the validity of the Act was upheld. Since the decision in the Old Dearborn Company case a number of other states have passed similar laws.

Considerable impetus to legislation fixing prices and prohibiting sales below-cost was given by the decision of the supreme court in the case of Nebbia v New York, 291 U. S. 502.

In 1933 the State of New York passed the "Milk Control Law" creating a Milk Control Board to fixe the price of milk in New York, the power of the Board to end on March 31, 1934. The primary purpose of the bill was to secure fair prices for producers of milk. It was made unlawful for a milk dealer to sell or buy or offer to sell or buy milk at any price less or more than the price fixed by the Milk Control Board. The Milk Control Board fixed a price of ten cents per quart for sales by a distributor to a consumer, and nine cents by a store to a consumer.

It is interesting to observe that in fixing the price of milk in New York, the Milk Control Board made a distinction be-

tween delivery distributors and "cash and carry" stores. The court said at page 530:

"In the order of which complaint is made, the Milk Control Board fixed a price of ten cents per quart for sales by a distributor to a consumer, and nine cents by a store to a consumer thus recognizing the lower costs of the store, and endeavoring to establish a differential which would be just to both."

Nebbia was the proprietor of a grocery store in Rochester and was convicted of violating the Board's order. He claimed that the statute and order contravened the equal protection clause and the due process clause of the 14th Amendment to the Constitution of the United States.

The court by a five to four decision, sustained the conviction, thus affirming the constitutionality of the Act. The court held, (syllabus 5):

"The due process clause of the Fourteenth Amendment conditions the exertion of regulatory powers by requiring that the end shall be accomplished by methods consistent with due process, that the regulation shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained."

For the reasons stated it is our opinion that the Ohio "Unfair Cigarette Sales Act" in fixing the same cost for cash and carry as for service wholesalers is "unreasonable, arbitrary and capricious" and also tends to fix uniform wholesale prices for cigarettes in Ohio and accordingly does not have "a real and substantial relation to the object sought to be attained" namely, the fostering of free, open and fair competition in the wholesale marketing of cigarettes.

The judgment of the Court of Common Pleas is therefore affirmed.

HURD, PJ, and SKEEL, J, concur.