BRISTOL-MYERS COMPANY, Plaintiff, *v.* IRVING PICKER et al., Co-partners Doing Business under the Name of PICKER PHARMACY, Defendants.

Supreme Court, Special Term, New York County, May 24, 1949.

*Isaac W. Digges* and *Gilbert H. Weil* for plaintiff.

*Frances Kneitel* and *Charles Green Smith* for defendants.

PECORA, J. This case squarely presents the problem of whether the use by defendants of so-called " cash register receipts " violates the provisions of the Fair Trade Law (General Business Law, § 369-a *et seq.*). This law permits the making of contracts fixing the minimum prices at which branded or trade-marked commodities may be resold by the buyer; and forbids the sale of any such commodities at less than such stipulated prices.

There is no substantial dispute as to the facts. This entire controversy revolves around the aforestated issue of law. Although the question has received the attention of Special Terms of this court, there is not, in my opinion, any decisive authority thereon in the reviewing courts of this State.

Certain determinations have been made by appellate tribunals in other jurisdictions. They are strongly relied upon by defendants to defeat this action by plaintiff for a permanent injunction to restrain defendants from issuing cash register receipts to customers purchasing plaintiff's products. The principal cases in which those rulings were made are: *Weco Products Co.* v. *Mid-City Cut Rate Drug Stores* (55 Cal. App. 2d 684 [1942]) and *Bristol-Myers Co.* v. *Lit Bros., Inc.* (336 Pa. 81 [1939]). Those cases involved the use of trading stamps instead of cash register receipts. Their reasoning was avowedly followed by the Special Terms of this court in the cases of *Nechamkin* v. *Picker* (189 Misc. 61 [Nassau Co.]) and *Palmer* v. *Angert* (195 Misc. 36 [Kings Co.]).

I have closely studied these interesting cases, as well as the others which have been cited by the learned counsel for defendants. I am constrained to say, however, that they fail to impress me with the soundness of their rationale. Therefore, I deem it necessary to consider anew the question here posed.

The plaintiff manufactures and markets various drug and cosmetic articles bearing brand or trade-marks, for which it has, over a period of many years, established a valuable good will. The two defendants, as copartners, own and operate a retail drug store in Lynbrook, Long Island. There they sell to the general public many kinds of drugs and cosmetics, including the trade-marked products of plaintiff.

Seeking to avail itself of the permission of the Fair Trade Law (General Business Law, § 369-a) the plaintiff has fixed minimum retail prices for its products, by contracts made with

their distributors. These contracts provide that the " Retailer will not, directly or indirectly, by any means, device, combination sale, trading stamp, free goods, discount, rebate, or other allowance or otherwise whatsoever, advertise, offer for sale or sell * * * any of Manufacturer's products * * * from whomsoever obtained, and wheresoever purchased by Retailer, at prices less than those set opposite the names of said commodities respectively." It is conceded that the defendants had knowledge of these contract provisions when they dealt, as hereinafter detailed, in the plaintiff's branded and trade-marked products.

The defendants are members of an organization composed of fifteen retail merchants in Lynbrook, named " Lynbrook Dividend Club, Inc.," — hereinafter called " Dividend Club ". It was formed upon the initiative of one of the defendants. Each member is a retail dealer in goods which do not compete with those of any other member. Any new members who may be admitted must also deal in noncompetitive goods. The merchandise retailed by its present members includes such articles as children's wear, curtains and draperies, drugs, fruits and vegetables, furniture and lamps, gifts, hardware, jewelry, ladies dresses and specialties, meats, men's haberdashery, rugs and linoleum, stockings and sports wear. Thus, under this plan of restricted membership the defendants are the only dealers in drugs and cosmetics in Lynbrook who belong to the Dividend Club, and who may receive the benefits thereof, although there are several other druggists in that community.

All of the members of the Dividend Club — including the defendants — give cash register receipts to their respective purchasing customers. These receipts are tokens which represent 2½% of the amount of each purchase. A customer who has purchased $10 worth of merchandise from a member, may redeem them for 25¢ worth of merchandise at the store of any dealer-member of the Dividend Club.

A typical form of printed descriptive advertising matter circulated by the Dividend Club reads as follows: " 2½% Is Your Dividend. All you have to do is to save the cash purchase receipts you receive from any member of the Lynbrook Dividend Club, Inc. They are worth 2½% of your purchases. Bring them to any member of the Club and they will redeem them in merchandise. (25¢ merchandise for every $10.00 receipts) * * * Remember: The more you spend the more you save." On the reverse side the names and store addresses of all the members of the Dividend Club are printed, together with a statement of the kind of merchandise dealt in by them respectively.

These cash register receipts — also sometimes referred to as cash purchase receipts — are accepted as cash at the rate of $2\frac{1}{2}\%$ of the amount of the purchases which are registered on them; but they can be redeemed only when they represent purchases aggregating $10 or a multiple thereof. Thus, as already stated, one purchasing drugs and cosmetics from the defendants upon accumulated cash register receipts of a total amount of $10 may obtain 25¢ worth of merchandise from defendants or from any other member of the Dividend Club upon the presentation of the receipts. In due course, each member pays every other member in cash for the full amount of merchandise given by such other member to customers of the first member in redemption of the cash register receipts issued by him.

By the foregoing plan the defendants sell the plaintiff's trade-marked products nominally at the minimum prices fixed in the plaintiff's fair trade contracts. In that way they render lip service to the terms of the contracts, and to the statutory provisions which authorize such contracts. At the same time, however, it is obvious that defendants actually give to their purchasers a $2\frac{1}{2}\%$ discount or rebate from the minimum contract prices of such products. Any realistic view of the circumstances under which the cash register receipts are issued and redeemed, in my opinion, leads irresistibly to the conclusion that their use constitutes a scheme, device or subterfuge whereby defendants, willfully and knowingly, deal in plaintiff's trade-marked articles at prices which are $2\frac{1}{2}\%$ less than their minimum fair-trade contract prices.

As already noted, the basic authorities upon which defendants claim validity for their scheme are *Weco Products Co.* v. *Mid-City Cut Rate Drug Stores* (*supra*) and *Bristol-Myers Co.* v. *Lit Bros. Inc.* (*supra*), both of which were decided in other jurisdictions. The fact that those cases involved the use of trading stamps instead of cash register receipts does not, in my opinion, distinguish them in principle from the instant case.

I find it impossible to accept as persuasive the grounds advanced in those two cases for the conclusions arrived at therein. There, for instance, the issuance of trading stamps was held to be a proper means of attracting customers to the issuer's store, comparable to such methods as the giving of free concerts in the store; or the furnishing of free parking space; or the facility of free nursing service for the tending of babies brought to the store by shoppers; or the providing of free bus service to patrons to and from the store. None of those means, however, affects the prices paid by a customer, except

perhaps remotely and indirectly. Those free services are offered to the public generally, and are not contingent upon the making of any purchase whatsoever by the shopper or customer obtaining their benefits. They do not affect the prices paid by customers for trade-marked wares; nor can they impair in any way the value of the good will which the producer of such articles has created.

The scheme in the case at bar, on the other hand, relates directly to the prices actually paid by a customer, as well as to the amount of his purchases. Under it, when the purchases are of trade-marked goods covered by fair-trade minimum price contracts, the customer is deliberately and intentionally given a $2\frac{1}{2}\%$ discount from the purchase price, through the issuance of the cash register receipts, just as effectively as if he received a rebate of $2\frac{1}{2}\%$ in cash. No other inference is consistent with the factual elements in the situation.

So far as concerns ordinary articles — those not branded or trade-marked — the method here employed may not give rise to any valid legal objection. The competitors in such commodities may meet that form of competition in any way they see fit. They own that species of property without qualification, and may, if they desire, retaliate by reducing prices still more. This may, of course, precipitate a " price war ". But the consequences of such cut-throat competition in articles which are neither branded nor trade-marked will generally fall principally, if not entirely, upon the competitors.

That is not, however, the result where branded or trade-marked goods are the subject of such competition. In those cases it may well work injury to the manufacturer or the owner of the brand or trade-mark, who is thus frequently made the innocent victim of price wars waged by retailers of his products. The good will which he has built up in the brand or trade-mark may be seriously affected by such a price war. It was to prevent that kind of injury, among other things, that led our Legislature to permit the owner of a trade-mark to fix the minimum prices at which retailers could sell the wares which are branded with it. That indubitably was the legislative intent in enacting our Fair Trade Law. That law may not, in my opinion, be evaded by any method or device which effectuates a diminution of the minimum contract price. The plan used by the defendants here directly accomplishes that result. Indeed, that fact is recognized by the authors of the plan; the advertising slogan which they use for it emphasizes that " the more you spend the more you save ".

I cannot sympathize with the view that small discounts may be disregarded under the maxim *de minimis non curat lex*. Nothing in our statute gives any sanction to that view, and courts should not write any such exception into the statute. The Legislature itself has seen fit to enumerate several exceptions from the prohibition of the statute; but it has not included any such exception among them. If it had intended to condone discounts or rebates from fixed prices of 2, 3, 5 or any other percentage small or large, the Legislature would undoubtedly have said so. Instead, it condemned as " unfair competition " and made " actionable " any sale " at less than the price stipulated " in the fair trade contract.

Neither can I look with favor upon the proposition that the use of these cash register receipts is a legal substitute for the extension of credit to a retail purchaser of trade-marked articles. Again, the answer is that the Legislature has failed to provide that as an exception to the statutory ban.

The same decent respect for the law as it is written serves also to dispel the contention of defendants that the cash register receipts are not objectionable, because the motive asserted for their use is to induce or attract customers to defendants' store. What could do that more effectively than direct price cuts? Doubtless many more customers would be drawn to their store if defendants sold plaintiff's trade-marked goods for half of their fixed contract prices. But no one in such a case would seriously heed the plea that the purpose thereof was merely to attract the public to defendants' store. Many things may legitimately be done to that end, such as advertising, elaborate store spectacles or displays, Thanksgiving Day parades, Christmas pageants, musical entertainments, etc. But palpably price-cutting — whether or not done openly or by subterfuge, may not be resorted to in dealing with trade-marked merchandise covered by fixed price contracts. Such a practice would offend against the primary intent of the statute.

I do not deem it necessary to discuss in detail the argument of the defendants that the Fair Trade Law, construed as aforesaid, is unconstitutional. In my opinion no substance remains in that contention under the decisions in *Old Dearborn Co.* v. *Seagram Corp.* (299 U. S. 183) and *Bourjois Sales Corp.* v. *Dorfman* (273 N. Y. 167).

It is my finding and conclusion (1) that the defendants are not entitled to issue the cash register receipts in the sale of the plaintiff's branded and trade-marked products unless they sell them at such prices as shall be at least 2½% above the fixed

minimum contract prices; and (2) that the defendants are free to sell other merchandise as they please in this regard. An injunction is awarded accordingly; and if the plaintiff desires to recover its damages, a referee will be appointed to assess the same. The plaintiff is granted costs.

The foregoing will constitute the decision of the court (Civ. Prac. Act, § 440). Settle judgment.