Griffith, J.
In Union Carbide & Carbon Corp. v. Bargain Fair, Inc. (1958), 167 Ohio St., 182, we determined that a prior Fair Trade Act (1936) containing a nonsigner provision was invalid. The syllabus reads:
“Section 1333.07, Revised Code, a part of the Ohio Fair Trade Act, which prohibits those who are not parties to a price-fixing contract between the producer of a trademarked commodity and another from selling such commodity for less than the price stipulated in such contract, represents an unauthorized exercise of the police power in a matter unrelated to the public safety, morals or general welfare, delegates legislative power to private persons, unconstitutionally denies the owner of property the right to sell it on terms of his own choosing and is invalid. ’ ’
In the Bargain Fair case we were concerned primarily with the nonsigner provisions. Following the judgment in that case, a new Ohio Fair Trade Act (128 Ohio Laws, 698) was enacted, which act became effective October 22, 1959, and it is this legislation that is now being assaulted and is the sole cause of this controversy.
The heart of the new act, the implied contract doctrine, is spelled out in Section 1333.28 (I), Revised Code. “Contract” is defined therein as ‘ ‘ any agreement, written or verbal, or arising from the acts of the parties.” That section provides further that a person who acquires a commodity ‘ ‘ directly from the proprietor or otherwise ’ ’ after actual notice that the proprietor has established a minimum resale price is bound to observe that price; and that such a person by accepting the commodity ‘ ‘ shall thereby have entered into an agreement with such proprietor *489 not to resell such commodity at less than the minimum price stipulated therefor by such proprietor.”
A person who acquires such commodity after actual notice and then sells, offers to sell or advertises to sell such commodity at a price lower than the established minimum resale price commits an act of unfair competition. Section 1333.32 (A), Revised Code.
Section 2, Article XIII, should not be read out of the Ohio Constitution or rendered meaningless. The provision means just what it says — the General Assembly can pass laws “regulating the sale and conveyance” of personal property. The new Ohio Fair Trade Act is just such a law. The new act is much more comprehensive than the prior act and introduces into the law two entirely new concepts.
It should be pointed out at this time that one element of the act cannot be overemphasized, namely, that the act applies only to trademark items which are in free and open competition with other goods of the same nature in the same general area. This is one of the most important features of this act. The act does not restrain competition since it may only apply to merchandise which is in free and open competition with goods of a like nature.
The first of the new concepts incorporated in this new act is contained in Section 1333.31, Revised Code, which reads as follows:
“A proprietor shall retain a proprietary interest in any commodity with respect to which he is a proprietor after he has sold it to distributors, so long as such commodity continues to be identified by his trademark or trade name, by reason of his interest in stimulating demand for such commodity through effective distribution to ultimate consumers and of his interest in continuing protection of the goodwill associated with his trademark or trade name.”
By this section, the General Assembly has extended the original concept of the trademark, that of protecting the owner from others marketing their goods under his trademark, to include as a part of the ownership a continuing proprietary interest in the trademark or trade name on the merchandise to the extent that the proprietor can control the resale price of the *490 merchandise even after it has left his possession and ownership. It is contended that the General Assembly has no power to create such ownership. In this the opponents of this legislation fail to take into consideration that all ownership of property and the incidents relating thereto arise only as a matter of law. Inasmuch as all ownership of property arises only by law, the law may also impose such reasonable conditions and incidents of ownership as are necessary to protect not only the owner but the public in general, i. e., such conditions as are necessary for the general welfare. Many such conditions are imposed by law. For example, land may be conveyed only by following the procedure prescribed by statutes, motor vehicles may be transferred only by certificate of title, and it is only because the law so provides that property may be transmitted by will. It is fundamental that property may be used only so long as its use does not interfere with the public welfare. Thus, although one may own a motor vehicle, the use thereof is subject to strict regulation. The ownership of property secured by the Constitution is necessarily subject to regulation by law. The General Assembly, after extensive and exhaustive hearings, determined that such extension of proprietary rights was necessary not only to protect the property rights incorporated in the ownership of a trademark or trade name but also to protect the small-business man and the public in general.
In such a matter, in the absence of conclusive evidence to the contrary we cannot substitute our judgment for that of the legislative body. "Where the wisdom of a legislative act is debatable, the legislative determination must stand.
“Where such questions of fact [the need for fair-trade legislation] are fairly debatable, this court does not substitute its judgment for that of the General Assembly but accepts and carries into effect its declared policy.” Kinsey Distilling Sales Co. v. Foremost Liquor Stores, Inc., 15 Ill. (2d), 182, 188.
This brings us to a consideration of the second of the new concepts incorporated in the new act. Section 1333.28 (I), Revised Code, reads as follows :
“ ‘Contract’ means any agreement, written or verbal, or arising from the acts of the parties. The establishment by a proprietor of a minimum resale price for any commodity pur *491 suant to the provisions of Section 1333.29 of the Revised Code and the proprietor’s permission for a distributor to acquire and use the proprietor’s interest in the trademark or trade name in reselling the commodity shall constitute a contract and sufficient consideration from the proprietor for a promise by the distributor not to sell such commodity at less than the minimum price established by the proprietor. Any distributor (whether he acquires such commodity directly from the proprietor or otherwise) who, with notice that the proprietor has established a minimum resale price for a commodity, accepts such commodity shall thereby have entered into an agreement with such proprietor not to resell such commodity at less than the minimum price stipulated therefor by such proprietor.”
This provision is the core of the act. When read in conjunction with the rest of the act, it provides in essence that, when a retailer with notice that an item has been fair-traded procures it for resale, he is deemed to have entered into an implied contract with the owner of the trademark that he will sell the item at the fair-trade price.
There is no question that express price maintenance contracts are valid. Garst v. Harris, 177 Mass., 72; Grogan v. Chaffee, 156 Cal., 611.
The statute creates an implied contract by act of the parties. The doctrine of implied contracts is almost as old as the law of contracts. The simple illustration of the appellees that, where one takes a candy bar from a grocer’s shelf and eats it, he obligates himself to pay for it is a basic example of an implied contract by act. No word need be said; conduct creates the contract.
It must be remembered that there is no compulsion on a retailer to handle the trademarked goods. Since the act applies only to goods which are in free and open competition with goods of the same nature, he may select other goods for sale. If he selects the fair-trade goods, it is his voluntary act, and he must abide by the conditions imposed thereon by the proprietor. The fact that he may not like the conditions is inconsequential. Most of us are forced by circumstances to enter into contracts where we do not like the conditions imposed on us, yet if we voluntarily accept the merchandise we must abide by the condi *492 tions attached thereto. For example, in purchasing a. home, there are in most instances restrictive covenants as to use. We may not like such conditions, but if we accept the contract we must abide thereby. Liking or not liking the conditions of acquiring property has no effect on the validity of the contract. If the retailer chooses to accept the goods, he is bound by the conditions imposed thereon, in this instance, the fair-trade price.
It is stated as follows in Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 299 U. S., 183,193, 194:
“Appellants here acquired the commodity in question with full knowledge of the then-existing restriction in respect of price which the producer and wholesale dealer had imposed, and, of course, with presumptive if not actual knowledge of the law which authorized the restriction. Appellants were not obliged to buy; and their voluntary acquisition of the property with such knowledge carried with it, upon every principle of fair dealing, assent to the protective restriction, with consequent liability under section 2 of the law by which such acquisition was conditioned. Cf. Provident Institution v. Jersey City, 113 U. S., 506, 514-515; Vreeland v. O’Neil, 36 N. J. Eq., 399, 402; same case on appeal, 37 N. J. Eq., 574, 577.”
Once trademarked goods come into Ohio the law imposes certain conditions thereon, and they are held subject to those conditions.
Legislative conditions and contracts are not new in the law, they appear in many instances, and once the parties enter into an agreement they are bound by the legislative contract no matter what the parties intended. This is exemplified in the law relating to insurance contracts wherein statutory provisions and conditions are imposed in every insurance contract no matter what the intent of the parties. This is true as to statutory bonds, negotiable instruments, bulk sales and mechanics’ liens.
This provision of the law is essentially very simple. It is simple contract law. The owner of a trademark offers his goods bearing that mark which are in free and open competition in the open market for resale, on condition that the retail price be maintained at a certain level. This is basic contract law; an offer may be made on condition. Under the Ohio law, the owner of the trademark, once the goods enter into Ohio, has by st'at *493 ■ute sufficient interest to control the resale price of the goods. The acceptance of this offer is purely voluntary, but if it is accepted it must be accepted on the imposed conditions or not at all. If the offer is accepted, the retailer in consideration of the goodwill attached to the trademark and the demand created by the owner thereof contracts to sell it at the agreed price.
We come now to a consideration of the power of the General Assembly to enact these sections. The avowed legislative purpose is contained in Section 1333.27, Revised Code, which reads as follows:
“ (A) Sections 1333.27 to 1333.34, inclusive, of the Revised Code, are enacted in the exercise of the police powers of the state and in pursuance of the power specifically granted the General Assembly by the people in Section 2 of Article XIII, Ohio Constitution, to regulate the sale and conveyance of personal property, and the purposes of Sections 1333.27 to 1333.34, inclusive, of the Revised Code, are generally to protect and preserve small business, to safeguard the goodwill of trademarks and trade names, to further wholesome competition, to prevent monopoly in the distribution of goods, and to promote the public welfare by securing wider distribution of commodities and an increase in the production thereof, and thereby reducing production and distribution costs, protecting and increasing gainful employment in manufacturing, wholesaling and retailing, all for the benefit of the consumer and the well-being of the citizens of the state.
“(B) It is the further purpose of Sections 1333.27 to 1333.34, inclusive, of the Revised Code, to promote the distribution in commerce in the state of identified merchandise which is in free and open competition with other articles of the same general class. Where fair, equitable, and competitive prices cannot be maintained in all appropriate stages in the distribution of such identified merchandise, the marketing of such merchandise is depressed and the quantity thereof moving in the channels of commerce in the state declines.
“(C) To remove obstructions to the marketing of identified merchandise in commerce which are occasioned by unfair selling practices, it is the policy of the state to afford distributors of identified merchandise an effective means whereby the *494 sale of such merchandise at all appropriate stages of distribution may be consummated at prices adequate to stimulate distribution and low enough to enable distributors of such identified merchandise to compete effectively with those marketing other goods, who by size and dominance may distribute such goods through their own retail outlets or by franchise or consignment methods, and to satisfy the needs of ultimate consumers.”
"Whether such conditions and controls are within the police power as declared by the General Assembly must be determined by an examination of known economic conditions.
Even to the most casual observer it is readily apparent that the small independent merchant is gradually being forced out of business through the operation of the large merchandising establishments. Even without discounting fair-trade items, these large merchants through their tremendous buying power are able by quantity buying to legitimately undersell the small merchant and to attract his trade. When, in addition to this legitimate underselling, the discounter uses fair-trade items as a come-on, selling items at cost or even at a loss to entice customers into his store, it is apparent that the small merchant will be doomed, he cannot afford to compete on this level, and his customers will go to the discounter to buy. Yet this small independent merchant is a necessary and integral part of the community. It is to him that the consumer turns for little-called-for items that the discounter does not choose to handle, and quite frequently it is to him that the customer turns for the personal service not rendered by the large discount establishments. Yet, as a result of the discounting of fair-trade merchandise, so much of his trade is being drained from him that he cannot afford to continue his business. Clearly, it is to the advantage of the general public that such establishments be preserved.
So much for the small-business man. We turn now to a consideration of the right to protect the owner of the trademark. It is beyond question that the goodwill of a trademark is a valuable property right. In McLean v. Fleming, 96 U. S., 245, 252, the court said:
“Everywhere courts of justice' proceed upon the ground *495 that a party has a valuable interest in the goodwill of his trade, and in the labels or trademark which he adopts to enlarge and perpetuate it. Hence it is held that he, as proprietor, is entitled to protection as against one who attempts to deprive him of the benefits resulting from the same, by using his labels and trademark without his consent and authority.”
The majority of present-day consumer purchasing is by brand name. Today the public demand necessary for retail selling is created to a great extent not by the retailer but by the manufacturer, the owner of the trademark. One of the greatest expenses of modern day merchandising is the creation of the demand for the product. This expense, which is borne in a great part by the proprietor, at times may even exceed the original manufacturing cost of the product itself. The value of any trademark is, of course, the demand for the product which it represents. The continued discount selling of a trademarked product eventually cheapens it in the eyes of the purchasing-public. If such product is sold at a reduced price the public will eventually get the idea that the product is cheap and turn to others, seeking higher quality merchandise. It does not occur to them that the quality is good and that the discounter is using the merchandise as a loss leader to advertise his store. This fact is well borne out by the fact that it is the owner of the trademark who urges that his merchandise be fair-traded. If discount selling did not injure his total sales, he would have no interest in the retail price. It must be remembered that the proprietor sells his goods at the same price and reaps the same unit profit no matter what price the ultimate consumer pays. Clearly, the owners of trademarks have discovered that discount selling of their products eventually cheapens them in the eyes of the public with the ultimate effect of injuring the value of the trademark or trade name and reducing their total sales. See National City Bank v. National City Window Cleaning Co., 174 Ohio St., 510.
When the general welfare of the small merchant is considered together with the necessity of protecting the goodwill and value attached to a trademark, it was clearly within the legislative power to enact such protective legislation, and the court will not substitute its judgment in this instance for that *496 of the General Assembly. In Old Dearborn v. Seagram, supra, at pages 195 and 196, the court said:
‘ ‘ There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the goodwill and business of the producer and distributor of identified goods, but injurious to the general public as well. The evidence to that effect is voluminous; but it would serve no useful purpose to review the evidence or to enlarge further upon the subject. True, there is evidence, opinion and argument to the contrary; but it does not concern us to determine where the weight lies. We need say no more than that the question may be regarded as fairly open to differences of opinion. The legislation here in question proceeds upon the former and not the latter view; and the legislative determination in that respect, in the circumstances here disclosed, is conclusive so far as this court is concerned. Where the question of what the facts establish is a fairiy-debatable one, we accept and carry into effect the opinion of the Legislature.”
Two other matters are urged as to the constitutionality of this legislation.
The first of these relates to the delegation of legislative power as to price fixing.
In the first place, this is not price fixing as commonly understood in the law. Here we have the producer of a commodity, which is in free and open competition with other goods of the same nature, fixing the price only of his own commodity; and not a fixing of prices for all the commodities in the same field. Here if a producer fixes his prices too high the consumer will turn to other producers for his needs.
Second, this is not legislative price fixing but price maintenance contracts between the producer and retailer, and the fact that such a contract may in some instances be implied does not affect the validity of the act. We have already found that such contracts are valid. Thus, this contention is not well founded.
The final contention is that such act violates the constitutional right of one to sell his own property on his own terms. It having been determined that the implied contracts herein are *497 valid, the retailer takes the goods on the conditions of the offer and thus voluntarily agrees to comply with the fair-trade price.
The G-eneral Assembly has re-enacted fair-trade laws in Ohio. In so doing it met constitutional objections to the former act (1936) expressed by this court in the Bargain Fair case. The nonsigner provision of the old law was eliminated. A retailer will be bound to fair-trade a product only by his own contract, either a written contract or a .contract implied under the specific statutory language from the retailer’s conduct in accepting the product for resale after notice of its being subject to fair trade.
It is the intention of the new act to declare and protect the proprietary interest of a manufacturer in his trademark and the goodwill attached to it. Cf. National City Bank v. National City Window Cleaning Co., supra. The means employed by the act is the long and well established legal doctrine of implied contract. None of the constitutional attacks on this new act have merit.
For the reason that fewer than six members of the court are of the opinion that the Fair Trade Act is unconstitutional, the court cannot so declare it. Section 2, Article IV, Constitution.
The judgments of the Court of Appeals are affirmed.

Judgments affirmed.

Taft, C. J-., and Herbert, J., concur.
Zimmerman, Matthias, O’Neill and Gtbson, JJ., dissent.