LANE DISTRIBUTORS, INC., A CORPORATION OF NEW JERSEY, APPELLANT, v. AMOS TILTON, SUPERVISOR OF THE CIGARETTE TAX BUREAU AND WALTER T. MARGETTS, STATE TREASURER OF THE STATE OF NEW JERSEY, RESPONDENTS.

Argued April 30, 1951—Decided June 18, 1951.

350

Mr. *Bernard Freedman* argued the cause for the appellant (*Messrs. Koehler, Augenblick & Freedman*, attorneys).

*Mr. Joseph A. Murphy,* Assistant Deputy Attorney-General, argued the cause for the respondents (*Mr. Theodore D. Parsons,* Attorney-General, attorney, *Mr. Benjamin M. Taub,* Deputy Attorney-General, on the brief).

The opinion of the court was delivered by

OLIPHANT, J. This appeal presents the question of the constitutionality of the Cigarette Tax Act, *P. L.* 1948, *c.* 65, as amended by *P. L.* 1950, *c.* 134, *R. S.* 54:40 *A–1, et seq.,* and the Unfair Cigarette Sales Act, *P. L.* 1948, *c.* 188, as amended by *P. L.* 1950, *c.* 135, *R. S.* 56:7–1, *et seq.*

It comes here from a determination of the Cigarette Tax Bureau of the Department of the Treasury which denied the plaintiff's application for a renewal of his wholesale dealer's cigarette license for the license year 1950-51, and while the appeal was pending before the Appellate Division of the Superior Court it was certified here on our own motion.

The plaintiff is a New Jersey corporation whose total outstanding capital stock consisting of nine shares is owned by the James Drug Stores, Inc., also a New Jersey corporation. We will refer to the plaintiff as Lane and the James Drug Stores, Inc., as James. This latter corporation, while organized under the general corporation laws, is essentially a cooperative whose stockholders are principally small independent druggists duly licensed under the Cigarette Tax Act, who have banded together to secure the advantages of buying in quantity so as to be better able to compete with large firms and chain stores. Where lawful to do so it purchased merchandise and resold it to its stockholder members at slightly above cost. Any net profits earned by Lane, if and when declared in the form of dividends, would be paid to James, its sole stockholder. Prior to the enactment of the Cigarette Tax Act and the Unfair Cigarette Sales Act, James handled the sale of cigarettes to its stockholders in the same manner as other merchandise.

On September 14, 1948, James procured a wholesale dealer's license which expired June 30, 1949, but did not secure a renewal for the year 1949-50. Instead it organized the plaintiff corporation which applied for and received a wholesale dealer's license for that year and during which it sold approximately $300,000 worth of cigarettes, all to the stockholders of James. These sales were made at prices fixed by the Unfair Cigarette Sales Act and the profits of Lane were paid to James in the form of dividends, but these moneys were not distributed by James to its stockholders as rebates in the same proportion as the profits realized by James on sales it made to its stockholders. However, these dividends, insofar as they found their way into profits of James would be available for capital improvements, etc., or dividends. It is apparent that however handled on the books of James they redounded directly or indirectly to the benefit of the stockholders. While Lane has stated its willingness to sell cigarettes to any and all retailers whether or not they are stockholders of James, the fact is that during the license year 1949-50 it made no sales to others than the stockholders of James.

On June 14, 1950, Lane applied to the Cigarette Tax Bureau for a renewal of its wholesale dealer's license and tendered the statutory fee. The application was denied on the grounds that since James owned all of Lane's stock and since all of Lane's customers were stockholders of James, those customers would receive, directly or indirectly, rebates, discounts or kickbacks on their purchases of cigarettes in violation of the provisions of the Unfair Cigarette Sales Act and that Lane failed to meet the statutory definition of a wholesaler as set forth in the Cigarette Tax Act. A wholesaler is there defined as

"d. 'Wholesale dealer' means any person in this State, other than a distributor, as defined herein, and other than a buying pool, as defined herein, who acquires cigarettes, at least seventy-five per centum (75%) of which are for purposes of resale to retail dealers in this State, for purposes of resale only, not connected with said wholesale

dealer by reason of any business connection or otherwise and who maintains an established place of business where cigarettes and related merchandise are sold at wholesale to persons licensed under this act, and where at all times a substantial stock of cigarettes and related merchandise is available to all retail dealers for resale."

The argument of the appellant is two-fold, (1) that it meets the definition and qualification of a wholesaler as provided in the Cigarette Tax Act; and (2) that both acts, the Cigarette Tax Act and the Unfair Cigarette Sales Act are unconstitutional under the Federal Constitution in that they constitute an unreasonable restraint upon interstate commerce and are in conflict with federal legislation relating thereto; and that they deprive it of its property without due process of law, deny it the equal protection of the law, and that the acts are unconstitutional under the New Jersey Constitution in that they unlawfully delegate legislative power to an administrative agency and are special legislation having been enacted without the required notice.

On the basis of the stipulated facts in the record it is clear that the Bureau is justified in its determination that Lane did not meet the statutory definition and qualifications of a wholesale dealer as set forth in the Cigarette Tax Act for a number of reasons. It did not make at least 75% of its sales to retail dealers not connected with it "by reason of any business connection or otherwise"; it sold only cigarettes and had no substantial stock of related merchandise available for resale; and, it was a buying pool defined in the act as "any combination, corporation, association, affiliation or group of retail dealers operating jointly in the purchase, sale, exchange, or barter of cigarettes, the profits from which accrue directly or indirectly to such retail dealers." *R. S.* 54:40 *A–2 S.*

It is obvious that James itself was not eligible for a wholesale dealer's license and it follows that the mere creation by it of another corporation, wholly owned by it, as a device to circumvent the provisions of the act would not operate to establish eligibility.

■ Are the acts constitutional? We are met preliminarily by the contention of the State that Lane cannot challenge the constitutionality of the Unfair Cigarette Sales Act, which has no provision for the issuance of licenses, until it shows it is entitled to a license under the Cigarette Tax Act; that one who suffers no injury by the operation of a statute cannot complain that that statute is unconstitutional. *Carroll v. Socony-Vacuum Oil Co.,* 136 *Conn.* 491, 68 *A. 2d.* 299, (*Sup. Ct. of Errors* 1949); *Hatch. v. Reardon,* 204 *U. S.* 152, 160, 27 *S. Ct.* 188, 51 *L. Ed.* 415 (1907); *Collins v. State of Texas,* 223 *U. S.* 288, 295, 32 *S. Ct.* 286, 56 *L. Ed.* 439 (1912); *Plymouth Coal Co. v. Commonwealth of Pennsylvania,* 232 *U. S.* 531, 34 *S. Ct.* 359, 58 *L. Ed.* 713 (1914); 1 *Willoughby, Constitutional Law* (*2d ed.*), *p.* 19, § 13. But the Cigarette Tax Act and the Unfair Cigarette Sales Act are *in pari materia*. They are part of the same statutory scheme. They became effective on the same date in 1948, the amendments to each act became effective on the same date in 1950 and they give definite evidence of the interdependence one on the other and the interrelation of one with the other. Section 15 of the Unfair Cigarette Sales Act provides among other things that the Director of the Division of Taxation may suspend or revoke any license issued under the provisions of the Cigarette Tax Act, and the rules and regulations of the Director promulgated thereunder, or for the failure of the licensee to comply with any provisions of the Unfair Cigarette Sales Act, or any rule or regulations, adopted thereunder. As a matter of fact, the refusal to renew plaintiff's license as a wholesale cigarette dealer was grounded in part on an alleged violation of provisions of the Unfair Cigarette Sales Act. It is apparent that Lane's inability to obtain a wholesale license under the Tax Act subjected it to a disadvantageous position under the Unfair Sales Act; it is adversely affected by both and the constitutional questions posed must be resolved as to both acts.

Two of the appellant's arguments may be summarily disposed of. First it contends that the acts are an undue

restraint upon interstate commerce in a field over which Congress has exercised its plenary interstate commerce jurisdiction, *Title* 15, *U. S. C.* § 13*a, et seq.*, which specifically provides that cooperative associations may, despite the rebate prohibition of the Federal Fair Trade Laws, return to their members "the whole or any part of the net earnings or surplus resulting from its trading operations, in proportion to their purchases or sales, from, to or through the Association."

■ On the facts of this case neither Lane nor James is engaged in interstate commerce, their sole connection therewith being the sale of nationally branded products which have previously been in interstate commerce. What plaintiff does is to purchase cigarettes, store them at its place of business and then resell them to licensed retail dealers located within this State. Its business is purely an intrastate activity. The federal legislation was designed to preclude the individual states from licensing and regulating the interstate dealers in such products, be they cooperatives or not. A state statute requiring a license for the purely local business of selling cigarettes, irrespective of the source of the goods sold, does not impose a burden upon interstate commerce which the Federal Constitution interdicts. *Caskey Baking Co. v. Commonwealth,* 313 *U. S.* 117, 61 *S. Ct.* 881, 85 *L. Ed.* 1223 (1941).

■ Secondly, as to the contention that the Tax Act is special legislation and therefore invalid under the State Constitution, *Art. IV, sec. VII, pars.* 7, 8 and 9 (8). This is general legislation though directed to the taxation and regulation of the sale of a specific product and even though in its operation it may as a matter of fact act to the benefit of some and to the detriment of others. The act is a general law imposing a tax on the sale of cigarettes, and for the purpose of licensing it classifies dealers into different categories. The Legislature may classify licensees based upon their method of doing business, just so persons similarly circumstanced are treated alike and receive equal protection. *Liggett Co. v. Lee,* 288 *U. S.* 517, 53 *S. Ct.* 481, 77 *L. Ed.*

929 (1933); *Singer Sewing Machine v. Brickel,* 233 *U. S.* 304, 34 *S. Ct.* 493, 58 *L. Ed.* 974 (1914); *Schwartz v. Essex County Bd. of Taxation,* 129 *N. J. L.* 129 (*Sup. Ct.* 1949). In *Ring, et al., v. North Arlington,* 136 *N. J. L.* 494 (*Sup. Ct.* 1948), affirmed 1 *N. J.* 24 (1948), appeal dismissed 335 *U. S.* 889, 69 *S. Ct.* 250, 93 *L. Ed.* 427 (1948), it was held that the state has a wide discretion as to classification of businesses and occupations for revenue and regulation and that the constitutional requirement is satisfied if the legislation is reasonably related to the object of the legislation, and, further that there may be a reasonable classification of the objects of the legislation or of the persons whom it affects; and in *State v. Garden State Racing Assn.,* 136 *N. J. L.* 173 (*E. & A.* 1947), the former Court of Errors and Appeals held that there is no express constitutional prohibition against the power of the Legislature to classify objects of legislation.

Considering first the Cigarette Tax Act, it is beyond question that the State can levy an excise tax on any commodity and can levy a license tax against persons engaged in any business. Such taxes are imposed under the power to raise revenue, not under the police power.

The taxes in question are levied specifically on the sale of and the business of selling cigarettes. They are not levied against "related merchandise" and a qualification as to "related merchandise" is fictitious and arbitrary because it cannot affect the amount of the excise tax or the license tax. The act does not define the phrase "related merchandise," if it is susceptible of precise definition, which we doubt, but leaves the decision as to its applicability to the pure discretion of the Commissioner. It involves a delegation of primary legislative power and duty which cannot be sustained.

For the purpose of classification in fixing license fees it is arbitrary and discriminating when included in the definition of "distributor" and "wholesaler" as it is in this act as amended.

The act as amended further provides that "a distributor" shall sell 75% of his stock to retailers or wholesalers who are not connected with him in business and a like provision as to sales by wholesalers to retailers. These provisions have no reasonable relation to the excise tax of 1½c on each ten cigarettes or to the difference in the license fees levied against distributors, wholesalers, or retailers. The amount of the excise tax accruing to the State under the act does not depend on the identity or type of the purchaser in the taxable transaction—the sale to the consumer of a pack of cigarettes—but only upon the volume of such sales in the aggregate in a given taxable year. A license tax must be based upon the nature of the transaction or business that is taxed. There are basic differences between a distributor who, under the act, is one who brings unstamped cigarettes into the State which are purchased directly from the manufacturer and sells them at wholesale, or is one who manufactures cigarettes no matter where sold or distributed, or is one retailing cigarettes to consumers if his purchases are made directly from manufacturers; a wholesaler is one who acquires cigarettes for the purpose of resale only to retail dealers; and a retail dealer is one selling exclusively to the buying public at retail. These differences can and should be recognized for the purpose of a license tax but the identity, type or form of entity of the purchaser can hardly be said to be one of them.

There is nothing reasonable in a tax act classification which excludes a buying pool or cooperative of small retailers, the members of which combine to buy large quantities of cigarettes for business reasons to enable them to successfully compete with large retailers such as chain store operators who have outlets in many stores, from the classifications of "distributors" and "wholesalers," and then defines a "distributor" as "any person *retailing* cigarettes to consumers provided at least seventy-five per centum (75%) of his purchases are made directly from the manufacturers thereof" and further on includes in the definition of a "wholesaler" a

vendor meaning "any person in this State who acquires cigarettes for the purpose of resale in cigarette vending machines, provided such person operates thirty or more machines"; noting that the restriction as to related merchandise does not seem to apply to these latter two groups.

It may well be that the manufacturers may or can dictate who their distributors are and that they do sell to chain stores directly as a matter of business policy. They have the right to be discriminatory. This may be the reality of one of the hard facts in the industry. But such discrimination cannot by legislative *fiat* be made the lawful basis of a classification for the levying of a license tax.

The Director, acting pursuant to section 20 of the act, on June 10, 1949, promulgated regulation C. T. 15 which provides that "Any person other than a licensed distributor, who acquires cigarettes solely for the purpose of resale in cigarette vending machines, provided such person operates and has on location thirty or more such machines, shall be deemed a wholesale cigarette dealer under the Cigarette Tax Act." This means that a vending machine operator can buy at wholesale and can receive the advantages of a wholesaler though he sells all his cigarettes strictly as a retailer. Such classification is arbitrary and discriminatory, operating to the disadvantage of one in the position of the plaintiff. There are many advantages flowing to a wholesaler, as exemplified in one instance by *R. S.* 56:7–5 relating to the meaning of "Cost to Wholesaler" in comparison with *R. S.* 56:7–4, defining "Cost to the Retailer." These two classes of actual retailers, large chain store operators classified as "distributors" and vending machine owners operating more than 30 machines, are given distinct advantages while the plaintiff, a cooperative, is denied those advantages.

The Cigarette Tax Act, though not purporting to be regulatory, is so designed, because of the manner in which the classes of those dealing in cigarettes are defined, as to prohibit certain persons, regardless of their desires and willingness to pay the required tax, from engaging in a legiti-

mate business of their choice. The right of a person to engage in a business of his choice is a property right, *Kravis v. Hock,* 136 *N. J. L.* 161 (*E. & A.* 1947), and should be protected against arbitrary interference by the State or its subdivisions, but this right must at times give way to the public's general welfare.

The various classifications contained in the act are not designed in any way to facilitate the levy and collection of the unit tax of 1½c on each ten cigarettes imposed by section 8 of the act.

██ The regulations accomplished by the Cigarette Tax Act are objectionable enough, but when the interrelation of this act with the Unfair Cigarette Sales Act is considered it becomes even more obvious that this plaintiff is being denied his constitutional rights. The regulation of private enterprise by public authority is valid only when done in the exercise of the police power of the State, and to be valid must bear a rational relationship to the protection of the public health, morals, general safety or welfare. *New Jersey Good Humor, Inc., v. Bradley Beach,* 124 *N. J. L.* 162 (*E. & A.* 1939); *Lakewood Express Service v. Board of Public Utility Commissioners,* 1 *N. J.* 45 (1948); *Abelson's, Inc., v. New Jersey State Board, etc.,* 5 *N. J.* 412 (1950); *Reingold v. Harper,* 6 *N. J.* 182 (1951). If the provisions of the act were reasonable, not discriminatory, and in the interest of the public welfare, they would be entitled to be enforced even though private rights are thereby curtailed.

By the terms of the Unfair Cigarette Sales Act the price at which wholesalers and retailers, as defined in the act, may buy and sell cigarettes is specifically regulated. Thus, by the Tax Act the plaintiff is prohibited from acting as a wholesaler and under the Unfair Cigarette Sales Act as a retailer is prohibited from buying and selling cigarettes at the same price at which they can be sold by a wholesaler. It and others similarly situated are' prohibited from competing in a lawful business solely because of the arbitrary and discriminatory classifications of the Tax Act and the arbitrary and

discriminatory classifications set up by the Unfair Cigarette Sales Act.

The definition of "wholesaler" as contained in the Unfair Cigarette Sales Act is a combination of the definitions of "distributor," "wholesale dealer" and "vendor" as contained in the Cigarette Sales Tax Act. As in the Tax Act a wholesaler is one who has at all times on hand a substantial stock of cigarettes and related merchandise, who sells 75% of his goods to retail dealers and other wholesalers not connected with him by reason of any business connection or otherwise, who retails cigarettes to consumers provided 75% of his purchases are made directly from manufacturers; any person other than a buying pool, who purchases cigarettes from a manufacturer at least 75% of which are for purposes of resale to retail dealers not engaged with him in any manner and who keeps a substantial stock of cigarettes and related merchandise on hand and sells them at resale to retail dealers for resale, and one who operates 30 or more vending machines who acquires cigarettes solely for resale in those machines.

"Retailer" is defined as any person who is engaged in this State in the business of selling cigarettes at retail and includes any group of persons, cooperative organizations, buying pools, and any other person or group of retailers purchasing cigarettes on a cooperative basis from licensed distributors or wholesalers.

The primary purpose of the Unfair Cigarette Sales Act is to prohibit the sale of cigarettes by a wholesaler or retailer by unfair practices below cost; it is not a price fixing statute, sections 3, 4 and 5 of the act.

The history of legislative acts such as the Unfair Cigarette Sales Act shows that in an endeavor to try to end the growth of trusts and monopolies leading to the destruction of small businesses through destructive price-cutting and competition Congress passed the Sherman Anti-Trust Act and the Clayton Act. These federal anti-trust laws were designed to meet interstate situations only, and in the early part of the

20th Century the various states began to enact unfair and anti-loss leader sales legislation until today 31 states have laws similar to our Unfair Cigarette Sales Act.

While it was a trade mark case under the Illinois statute, the underlying philosophy was recognized and established by the United States Supreme Court in *Old Dearborn Distilling Co. v. Seagram Distillers Corp.*, 299 *U. S.* 183, 57 *S. Ct.* 139, 81 *L. Ed.* 109 (1936), in which the court said:

> "There is a great body of fact and opinion tending to show that price-cutting by retail dealers is not only injurious to the good will and business of the producer and distributors of identified goods, but injurious to the general public as well. The evidence to that effect is voluminous; but it would serve no useful purpose to review the evidence or to enlarge further upon the subject. True, there is evidence, opinion and argument to the contrary; but it does not concern us to determine where the weight lies. We need say no more than that the question ·may be regarded as fairly open to the differences of opinion. The legislation here in question proceeds upon the former and not the latter view; and the legislative determination in that respect, in the circumstances here disclosed, is conclusive so far as this court is concerned. Where the question of what the facts establish is a fairly debatable one, we accept and carry into effect the opinion of the Legislature."

The legislation in effect today throughout the various states has assumed various forms, depending upon the economic views and legal preferences of the various legislatures. In this State it took the form of a statute prohibiting sales below cost. Our Legislature recognized the evils of price-cutting and declared as a matter of fact that price-cutting is an unfair method of competition, as set forth in the preamble of the act.

The business of dealing in cigarettes for sale, either wholesale or retail, does not in itself affect the public interest and is not subject to public regulation for the protection· of that interest, and traffic in cigarettes is not a business "devoted to a public use and its use thereby in effect granted to the public" but is *juris privata* only. *Williams v. Standard Oil*, 278 *U. S.* 235, 49 *S. Ct.* 115, 73 *L. Ed.* 287 (1929). Public concern for the maintenance of the particu-

lar business is not enough to justify regulatory legislation and supervision; the public must have an interest in the use calling for public regulation to serve that interest.

The phrase "affected with the public interest" in the nature of things means no more than that an industry, for adequate reason, is subject to control for the public good, for the preservation and promotion of the public welfare, and under the police power a legislature may make provision for the economic welfare of the people generally. Whether free and unlimited competition in an industry shall prevail is an economic question and the policy with reference thereto is primarily for the legislature to determine. Courts are not concerned with the wisdom of such legislation; their function is to determine whether or not the statute is one having a lawful purpose for its object. The expediency of the statute is for the law-making body alone. *Jacobson v. Massachusetts*, 197 *U. S.* 11, 25 *S. Ct.* 358, 49 *L. Ed.* 643 (1905); *Euclid v. Ambler Realty Co.*, 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.* 303 (1926); *Standard Oil Co. v. Marysville*, 279 *U. S.* 582, 49 *S. Ct.* 430, 73 *L. Ed.* 856 (1929); *Reingold v. Harper, supra*. The matter of price-cutting, rebates, discounts, or of selling below cost is one that may be regarded as directly affecting the welfare of the community and hence within the limits of the regulation authorized by the police power. In *Old Dearborn Distilling Co. v. Seagram Distillers Corp., supra*, the U. S. Supreme Court expresses clearly the situation in this regard. Our Legislature has expressly pronounced that such practice affects the public welfare. A court cannot say it does not do so.

It is not always essential that a business be wholly affected with a public interest to be subject to regulation. A business may be essentially private in nature and yet that in no wise precludes the Legislature from prohibiting certain courses of conduct that may be resorted to for the purpose of injuring competitors or destroying competition.

The police power is not limited to the protection of the public health, morals and safety. It extends also to

economic needs and may protect from economic harm. *Veix v. 6th Ward B. & L. Ass'n.*, 123 *N. J. L.* 356 (*E. & A.* 1939); 310 *U. S.* 32, 60 *S. Ct.* 792, 84 *L. Ed.* 1061 (1940); *Bucsi v. Longworth B. & L. Ass'n.*, 119 *N. J. L.* 120 (*E. & A.* 1937).

"When conditions in a business become such that the welfare of the public will not be adequately protected by unrestricted competition, or if it be shown that ruinous and chaotic conditions are otherwise about to be brought about by the business, that the economic existence of large numbers of people is being threatened then the law may step in and prescribe regulations to correct the alleged or threatened abuses." *Miami Laundry Co. v. Florida Dry Cleaning L. Bd.*, 183 *So.* 759 (*Fla. Sup. Ct.* 1938), citing *Nebbia v. New York*, 291 *U. S.* 502; *Borden's Farm Products Co., Inc., v. Ten Eyck*, 297 *U. S.* 251, 56 *S. Ct.* 453, 80 *L. Ed.* 669 (1936); *West Coast Hotel Co. v. Parrish*, 300 *U. S.* 379, 57 *S. Ct.* 578, 81 *L. Ed.* 703 (1937); *Highland Farms Dairy v. Agnew*, 300 *U. S.* 608, 57 *S. Ct.* 549, 81 *L. Ed.* 835 (1937).

The statute under attack is, as said, not a price-fixing statute; its only purpose is to require that the commodity not be sold at a loss when the purpose of such a sale is not legitimate. Such statutes have been justified constitutionally in many instances. As the U. S. Supreme Court said in *Mayo v. Lakeland Highland Cannery Co.*, 309 *U. S.* 310, 60 *S. Ct.* 517, 84 *L. Ed.* 774 (1940), "The mere fact that an act fixes prices is, in itself, insufficient to invalidate it; an allegation of that fact does not raise substantial federal questions * * *." See 11 *Am. Jur.* 1042, *par.* 282. The Supreme Court of Minnesota, in upholding the Minnesota act prohibiting sales below cost said in *McElhone v. Geror*, 207 *Minn.* 580, 292 *N. W.* 414, 418 (1940):

"The legislature is attempting to protect retailers and the public from unfair trade practices. It is not for us to deny its conclusion of fact that sales below cost are harmful and constitute a trade practice so unfair and injurious as to require legislative attention. The Act declares and implements valid policy."

The legislative finding of fact made by the Minnesota Legislature was expressed in much the same language as the finding made by the New Jersey Legislature in our act.

There has been the thought that while the police power of the State included the power to regulate prices in certain businesses, such as the fixing of rates for public utilities and the prices of the essentials of life, or the fixing of prices generally in an effort to maintain economic stability in times of emergency because such regulation is "affected with public interest," *Spring Valley Water Works v. Schottler,* 110 *U. S.* 347, 4 *S. Ct.* 48, 28 *L. Ed.* 173 (1884), it has been contended that acts such as the instant one are invalid because they attempt to regulate an enterprise which is not affected with the public interest. This contention has been consistently overruled.

The case of *Nebbia v. New York,* 291 *U. S.* 502, 54 *S. Ct.* 505, 78 *L. Ed.* 940 (1934), involved a statute regulating the price of milk which, it might be said, is a commodity affecting the health and welfare of the public generally, but the principle therein set forth is applicable. The court held a state free to adopt whatever economic policy may reasonably be deemed to promote public welfare and to enforce that policy by legislation adopted to its purpose. It held courts to be without authority to declare such policy or, when declared by the legislature, to override it provided the legislation be neither arbitrary nor discriminatory. The opinion said:

" 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' *Northern Securities Co. v. United States,* 193 *U. S.* 197, 337, 338, 24 *Sup. Ct.* 436, 48 *L. Ed.* 679. It is equally clear that if the legislative policy be to curb unrestrained and harmful competition *by measures which are not arbitrary or discriminatory* it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the Legislature *is primarily the judge of the necessity of such an enactment, that*

every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power." "* * * The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. *Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt,* and hence an unnecessary and unwarranted interference with individual liberty." (Italics supplied.)

Thirty-one states have enacted legislation prohibiting sales of commodities below cost. Whenever the acts have been questioned the courts uniformly have agreed that the Legislature had the constitutional right to accomplish the result intended. In instances certain provisions of the acts have been held to be invalid, but where this has occurred it was not a question of the right of the legislature to act but a question of the reasonableness of the method employed or the definiteness thereof. No state has declared that the exercise of the police power in forbidding loss-leader selling is unconstitutional *per se.* See *Wholesale Tobacco Bureau of Southern California, Inc., v. National Candy & Tobacco Co.,* 82 *P. 2d* 3 *(Sup. Ct. of Cal.* 1938) ; *Associated Merchants of Montana v. Ormscher,* 107 *Mont.* 530, 86 *P. 2d* 1031 (1939).

The latest pronouncement on the constitutionality of Unfair Cigarette Sales Act legislation is *Mays Drug Stores, Inc., v. State Tax Commission,* 45 *N. W. 2d* 245 *(Sup. Ct. of Iowa* 1950) in which the court held the Iowa statute which closely parallels the New Jersey Act constitutional. The court said:

"No one at this date questions the right of legislature to enact measures under its police power, that are designed to prohibit acts which threaten free competition * * *."
" 'We have no hesitancy in holding that, generically, legislation prohibiting unfair competition and preventing acts which stifle competition, is well within the surveyed limits of the police power.' *People v. Kahn,* 19 *Cal. App. 2d Supp.* 758, 60 *P. 2d* 596, 599."

We would have no hesitancy in holding the Unfair Cigarette Sales Act constitutional were its provisions setting up the different categories not arbitrary and discriminatory.

"Price control to serve the common interest is a permissible exercise of the police power where the business is affected with the public interest; but it is a fundamental requirement that the regulation be reasonable and uniform in its operation and effect and not arbitrary or capricious. * * * It is axiomatic that the exertion of governmental authority in this field cannot be deemed reasonable if it is discriminatory." *Duff v. Trenton Beverage Co.*, 4 *N. J.* 595 (1950).

As the regulation of the industry is accomplished in the Unfair Cigarette Sales Act, as in the Tax Act, it is arbitrary, capricious and discriminatory. The plaintiff, because it is a corporation wholly owned by another corporation whose stockholders are independent cigarette dealers and because its sales are made wholly to those retail dealers, is deprived of the right to sell its cigarettes at wholesale prices, whereas if it made 75% of its sales to retailers with whom it had no corporate or business connection, or if it was a single corporation, such as a chain, or if it was a vendor operating more than 30 vending machines, it would not suffer the deprivation. It is likewise compelled to keep "related merchandise" for sale, with which we have heretofore dealt.

Our conclusion is that these two acts under attack are in part both individually and in combination arbitrary and discriminatory, and unconstitutionally deprive the plaintiff of its right to engage in a lawful business in competition with others. The Tax Act is arbitrary, discriminatory and unconstitutional as it defines "wholesale dealer," "retail dealer" and "vendor" and as it fixes the license fees required for each of these categories. The Unfair Cigarette Sales Act is unconstitutional as it defines "distributor," "wholesaler" and "retailer."

Each of the acts specifically provide that their provisions shall be deemed to be severable and if any provision is determined to be unconstitutional such determination shall not be held to affect any other provision. The settled rule regarding severability as laid down in the cases is that while

a statute may be in part constitutional and in part unconstitutional, if the Legislature would have passed the constitutional parts independently of those deemed unconstitutional and the different parts of the statute are not so intimately connected with and dependent upon each other so as to make the statute one composite whole, unconstitutional parts may be rejected and the constitutional parts may stand. *Johnson v. State,* 59 *N. J. L.* 535 (*E. & A.* 1896); *Riccio v. Hoboken,* 69 *N. J. L.* 649 (*E. & A.* 1903); *McCran v. Ocean Grove,* 96 *N. J. L.* 158 (*E. & A.* 1921); *Wilentz v. Galvin,* 125 *N. J. L.* 455 (*Sup. Ct.* 1940).

It is clear that section 1 and section 2 of *P. L.* 1950, chapter 134, amending sections 102 and 202, *P. L.* 1948, chapter 65, are unconstitutional, and since the other sections of *P. L.* 1950, chapter 134, contain amendments and supplements to sections relating to the administration and enforcement of the act these provisions are separable. The voiding of sections 1 and 2, *P. L.* 1950, chapter 134, leaves sections 102 and 202, *P. L.* 1948, chapter 65, unaffected by the amendment. *Washington Nat'l. Ins. Co. v. Board,* 1 *N. J.* 545, 557 (1949). The pre-existing statute was not impaired by the abortive amendment thereof. *Crater v. County of Somerset,* 123 *N. J. L.* 407 (*E. & A.* 1939). However, the definition of "wholesaler" in section 102(d), *P. L.* 1948, chapter 65 is void for the reasons stated with respect to the same category as defined in *P. L.* 1950, chapter 134, section 1(d).

As to the Unfair Cigarette Sales Act, it is one integral whole and the act is dependent upon the definitions contained in section 2. The act is wholly ineffective and meaningless without the definitions of "wholesaler" and "retailer." It is clear the Legislature would not have enacted the legislation without some definition of these categories of dealers. Having determined that these definitions as contained in the act are unconstitutional this whole act, *P. L.* 1948, *c.* 188, as amended by *P. L.* 1950, *c.* 135 must fall.

The determination of the Cigarette Bureau of the Department of the Treasury in denying plaintiff's application for a wholesale dealer's license for the year 1950-51 is reversed for the reasons herein expressed and set aside for nothing holden.

HEHER, J., concurring in result.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For affirmance*—None.