## OLD DEARBORN DISTRIBUTING CO. *v.* SEA-GRAM-DISTILLERS CORP.*

No. 226. Argued November 12, 13, 1936.—Decided December 7, 1936.

---

* Together with No. 372, *McNeil* v. *Joseph Triner Corp.* Appeal from the Supreme Court of Illinois.

*Messrs. Irving Breakstone* and *Nicholas J. Pritzker* for appellant in No. 226.

*Mr. Richard Mayer,* with whom *Messrs. Isaac H. Mayer* and *Carl Meyer* were on the brief, for appellee in No. 226.

*Messrs. Stanford Clinton* and *J. Herzl Segal,* with whom *Mr. Nicholas J. Pritzker* was on the brief, for appellant in No. 372.

*Mr. Hamilton Moses,* with whom *Messrs. Walter Bachrach, Stanley Morris,* and *Miss R. Weyand* were on the brief, for appellee in No. 372.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

These appeals bring here for decision the question of the constitutional validity of §§ 1 and 2 of the Fair Trade Act of Illinois (Smith-Hurd Rev. Stat., 1935, c. 121-½, § 188 *et seq.*; Illinois State Bar Stat., 1935, c. 140, § 8 *et seq.*), providing as follows:

"Section 1. No contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, the trade mark, brand or name of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of the State of Illinois by reason of any of the following provisions which may be contained in such contract:

"(1) That the buyer will not resell such commodity except at the price stipulated by the vendor.

"(2) That the producer or vendee of a commodity require upon the sale of such commodity to another, that such purchaser agree that he will not, in turn, resell except at the price stipulated by such producer or vendee.

"Such provisions in any contract shall be deemed to contain or imply conditions that such commodity may be resold without reference to such agreement in the following cases:

"(1) In closing out the owner's stock for the purpose of discontinuing delivery of any such commodity: pro-vided, however, that such stock is first offered to the manufacturer of such stock at the original invoice price, at least ten (10) days before such stock shall be offered for sale to the public.

"(2) When the goods are damaged or deteriorated in quality, and notice is given to the public thereof.

"(3) By any officer acting under the orders of any court.

"Section 2. Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section 1 of this Act, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby."

Section 3 of the act provides that it shall not apply to contracts or agreements between producers or between wholesalers or between retailers as to sale or resale prices.

No. 226 is a suit brought by appellee against appellant to enjoin the latter from wilfully and knowingly advertising, offering for sale or selling, certain brands of whisky at less than prices stipulated by appellee in accordance with contracts, made in pursuance of the Fair Trade Act, between appellee and distributors or retailers of such whisky. The facts set forth by the court below follow.

Appellee is a dealer in alcoholic beverages at wholesale. It buys the products here in question from the producers. The whiskies bear labels and trade-marks, and are in fair and open competition with commodities of the same general class produced by others. Appellant is a corporation operating four retail liquor stores in Chicago,

and selling at both wholesale and retail. Appellee's sales in Chicago are made to wholesale distributors. It has not sold any of the whiskies in controversy to appellant, but has sold other liquors. Contracts in pursuance of the Fair Trade Act have been executed between appellee and certain distributors, and numerous Illinois retailers. Appellee does not sell directly to any retailer. Appellant sold the products in question at cut prices—that is to say, at prices below those stipulated—and continued to do so after appellee's demand that it cease such practice. The result of such price cutting was a diminution of sales during the price-cutting period suffered by appellee and retailers other than appellant. Some dealers ceased to display the products, and notified appellee that they could not compete with appellant and would discontinue handling the products unless the price cutting was stopped. Appellant was also a party to breaches of other fair-trade contracts between appellee and certain distributors, and continued the price cutting throughout the trial of the case in the Illinois state court of first instance.

The record shows that one of the retailer's contracts drawn in pursuance of the act was signed by appellant's secretary and treasurer prior to the commission of the acts complained of. This contract, among other things provided that the product in question should not be sold, advertised or offered for sale in Illinois below the prices to be stipulated by appellee. The contract was assailed by appellant below as ineffective, and for present purposes we accept that view. It is plain enough, however, that appellant had knowledge of the original contractual restrictions and that they constituted conditions upon which sales thereafter were to be made.

No. 372 is a suit of the same character as No. 226, seeking the same relief by injunction. The facts set forth in the complaint were admitted by a motion to dismiss. These facts, fully stated in the opinion of the court below,

*infra,* we find it unnecessary to repeat. It is enough to say that while they differ in detail from those appearing in No. 226, they are sufficiently the same in substance as to be controlled by the same principles of law.

Both appellants attack the validity of the act upon the grounds that it denies due process of law and the equal protection of the laws in violation of the Fourteenth Amendment in the particulars which hereafter appear. The state courts of first instance in which the suits were brought sustained the validity of the act and entered decrees as prayed for in the bills of complaint. These decrees were affirmed upon appeal by the court below. 363 Ill. 559, 2 N. E. (2d) 929; 363 Ill. 611, 2 N. E. (2d) 940.

The Illinois statute constitutes a legislative recognition of a rule which had been accepted by many of the state courts as valid at common law. This rule was based upon the distinction found to exist between articles of trade put out by the manufacturer or producer under, and identified by, patent, copyright, trade-mark, brand, or similar device, and articles of like character put out by others and not so identified. The same rule was followed for a time by some of the lower federal courts; but their decisions were upset by this court in a series of cases, of which *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373 is an example. In that case this court held that a system of contracts between manufacturers and wholesale and retail merchants which sought to control the prices for sales by all such dealers by fixing the amount which the consumer should pay, amounted to an unlawful restraint of trade, invalid at common law and, so far as interstate commerce was affected, invalid under the Sherman Anti-trust Act of July 2, 1890; and it was held that the rule applied to such agreements notwithstanding the fact that they related to proprietary medicines made under a secret process and identified by dis-

tinctive packages, labels and trade-marks. The argument that since the manufacturer might make and sell or not as he chose, he could lawfully condition the price at which subsequent sales could be made by the purchaser, was rejected.

"If there be an advantage to a manufacturer in the maintenance of fixed retail prices," this court said at pages 407–409, "the question remains whether it is one which he is entitled to secure by agreements restricting the freedom of trade on the part of dealers who own what they sell. As to this, the complainant can fare no better with its plan of identical contracts than could the dealers themselves if they formed a combination and endeavored to establish the same restrictions, and thus to achieve the same result, by agreement with each other. If the immediate advantage they would thus obtain would not be sufficient to sustain such a direct agreement, the asserted ulterior benefit to the complainant cannot be regarded as sufficient to support its system. . . . The complainant's plan falls within the principle which condemns contracts of this class. It, in effect, creates a combination for the prohibited purposes. No distinction can properly be made by reason of the particular character of the commodity in question. It is not entitled to special privilege or immunity. It is an article of commerce and the rules concerning the freedom of trade must be held to apply to it. . . . The complainant having sold its product at prices satisfactory to itself, the public is entitled to whatever advantage may be derived from competition in the subsequent traffic."

It is unnecessary to review the contrary state decisions. It is enough, for present purposes, to say that, generally speaking, they sustained contracts standardizing the price at which "identified" commodities subsequently might be sold, where the price standardization is primarily effected to protect the good will created or enlarged by the identi-

fying mark or brand. Where a manufacturer puts out an article of general production identified by a special trade-mark or brand, the result of an agreement fixing the subsequent sales price affects competition between the identified articles alone, leaving competition between articles so identified by a given manufacturer and all other articles of like kind to have full play. In other words, such restraint upon competition as there may be is strictly limited to that portion of the entire product put out and plainly identified by a particular manufacturer or producer.

The ground upon which the opposing view of this court proceeds is that such an agreement, nevertheless, constitutes an unlawful restraint of trade at common law and, in respect of interstate commerce, a violation of the Sherman Anti-trust Act. A careful reading of the decisions discloses no other ground.

Following these decisions, bills were introduced in Congress from time to time authorizing standardization-of-price agreements in respect of identified goods, upon which extensive hearings were held by the appropriate Congressional committees. These bills are in all essential respects like the Illinois act. The hearings disclose exhaustive legal briefs, and testimony and arguments for and against the economic value of the proposed laws. See, for example, Hearings before the Committee on Interstate and Foreign Commerce of the House of Representatives, on H. R. 13305 (63d Cong., 2d and 3d Sess.); H. R. 13568 (64th Cong., 1st and 2d Sess.); compare Report of the Federal Trade Commission on Resale Price Maintenance, 70th Cong., 2d Sess., H. Doc. No. 546.

It is not without significance that while the proposed legislation was vigorously assailed in other respects, we do not find that any constitutional objection was urged. And the decisions of this court, far from suggesting any constitutional infirmity in such proposed legislation, con-

tain implications to the contrary. In the *Dr. Miles Medical Co.* case (p. 405), the court said, "Nor can the manufacturer by rule and notice, *in the absence of contract or statutory* right, even though the restriction be known to purchasers, fix prices for future sales." (Italics supplied.) In *Boston Store* v. *American Graphophone Co.,* 246 U. S. 8, where this court struck down a stipulation that patented articles should not be resold at prices other than those fixed presently and from time to time by the patent owner, it was suggested (p. 26) that if this view resulted in damage to the holders of patent rights or the law afforded insufficient protection to the inventor, the remedy lay within the scope of legislative (that is to say, Congressional) action. And in a concurring opinion (p. 28), it was said, "If the rule so declared is believed to be harmful in its operation, the remedy may be found, as it has been sought, through application to the Congress . . ." The words "as it has been sought" quite evidently referred to the bills of which we have just spoken, since they had theretofore been introduced and made the subject of the hearings. See, also *Bauer & Cie* v. *O'Donnell,* 229 U. S. 1, 12. While these observations of the court cannot, of course, be regarded as decisive of the question, they plainly imply that the court at the time foresaw no valid constitutional objection to such legislation, for it cannot be supposed that the court would suggest a legislative remedy the validity of which might seem open to doubt.

In the light of the foregoing brief résumé of the question with respect to the standardization of selling prices of identified goods in the absence of statutory authority, we proceed to a consideration of the specific objections to the constitutionality of the act here under review.

*First.* In respect of the due process of law clause, it is contended that the statute is a price-fixing law, which has the effect of denying to the owner of property the right

to determine for himself the price at which he will sell. Appellants invoke the well-settled general principle that the right of the owner of property to fix the price at which he will sell it is an inherent attribute of the property itself, and as such is within the protection of the Fifth and Fourteenth Amendments. *Tyson & Brother* v. *Banton*, 273 U. S. 418, 429; *Wolff Co.* v. *Industrial Court*, 262 U. S. 522, 537; *Ribnik* v. *McBride*, 277 U. S. 350; *Williams* v. *Standard Oil Co.*, 278 U. S. 235; *New State Ice Co.* v. *Liebmann*, 285 U. S. 262. These cases hold that, with certain exceptions, which need not now be set forth, this right of the owner cannot be denied by legislative enactment fixing prices and compelling such owner to adhere to them. But the decisions referred to deal only with legislative price fixing. They constitute no authority for holding that prices in respect of "identified" goods may not be fixed under legislative leave by contract between the parties. The Illinois Fair Trade Act does not infringe the doctrine of these cases.

Section 1 affirms the validity of contracts of sale or resale of commodities identified by the trade-mark, brand or name of the producer or owner, which are in fair and open competition with commodities of the same general class produced by others, notwithstanding that such contracts stipulate (1) that the buyer will not resell except at the price stipulated by the vendor; and (2) that the producer or vendee of such a commodity shall require, upon the sale to another, that he agree in turn not to resell except at the price stipulated by such producer or vendee. It is clear that this section does not attempt to fix prices, nor does it delegate such power to private persons. It *permits* the designated private persons to contract with respect thereto. It contains no element of compulsion but simply legalizes their acts, leaving them free to enter into the authorized contract or not as they may see fit. Thus far, the act plainly is not open to objection; and none seems to be made.

The challenge is directed against § 2, which provides that wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract made under § 1, whether the person doing so is or is not a party to the contract, shall constitute unfair competition, giving rise to a right of action in favor of anyone damaged thereby.

It is first to be observed that § 2 reaches not the *mere* advertising, offering for sale or selling at less than the stipulated price, but the doing of any of these things *wilfully* and *knowingly*. We are not called upon to determine the case of one who has made his purchase in ignorance of the contractual restriction upon the selling price, but of a purchaser who has had definite information respecting such contractual restriction and who, with such knowledge, nevertheless proceeds wilfully to resell in disregard of it.

In the second place, § 2 does not deal with the restriction upon the sale of the commodity *qua* commodity, but with that restriction because the commodity is identified by the trade-mark, brand or name of the producer or owner. The essence of the statutory violation then consists not in the bare disposition of the commodity, but in a forbidden use of the trade-mark, brand or name in accomplishing such disposition. The primary aim of the law is to protect the property—namely, the good will— of the producer, which he still owns. The price restriction is adopted as an appropriate means to that perfectly legitimate end, and not as an end in itself.

Appellants here acquired the commodity in question with full knowledge of the then-existing restriction in respect of price which the producer and wholesale dealer had imposed, and, of course, with presumptive if not actual knowledge of the law which authorized the restriction. Appellants were not obliged to buy; and their voluntary acquisition of the property with such knowledge carried

with it, upon every principle of fair dealing, assent to the protective restriction, with consequent liability under § 2 of the law by which such acquisition was conditioned. Cf. *Provident Institution* v. *Jersey City,* 113 U. S. 506, 514–515; *Vreeland* v. *O'Neil,* 36 N. J. Eq. 399, 402; same case on appeal, 37 N. J. Eq. 574, 577.

We find nothing in this situation to justify the contention that there is an unlawful delegation of power to private persons to control the disposition of the property of others, such as was condemned in *Eubank* v. *Richmond,* 226 U. S. 137, 143; *Seattle Trust Co.* v. *Roberge,* 278 U. S. 116, 121–122; and *Carter* v. *Carter Coal Co.,* 298 U. S. 238, 311. In those cases the property affected had been acquired without any preëxisting restriction in respect of its use or disposition. The imposition of the restriction *in invitum* was authorized after complete and unrestricted ownership had vested in the persons affected. Here, the restriction, already imposed with the knowledge of appellants, ran with the acquisition and conditioned it.

Nor is § 2 so arbitrary, unfair or wanting in reason as to result in a denial of due process. We are here dealing not with a commodity alone, but with a commodity plus the brand or trade-mark which it bears as evidence of its origin and of the quality of the commodity for which the brand or trade-mark stands. Appellants own the commodity; they do not own the mark or the good will that the mark symbolizes. And good will is property in a very real sense, injury to which, like injury to any other species of property, is a proper subject for legislation. Good will is a valuable contributing aid to business— sometimes the most valuable contributing asset of the producer or distributor of commodities. And distinctive trade-marks, labels and brands, are legitimate aids to the creation or enlargement of such good will. It is well settled that the proprietor of the good will "is entitled to protection as against one who attempts to deprive him

of the benefits resulting from the same, by using his labels and trade-mark without his consent and authority." *McLean* v. *Fleming,* 96 U. S. 245, 252. "Courts afford redress or relief upon the ground that a party has a valuable interest in the good-will of his trade or business, and in the trade-marks adopted to maintain and extend it." *Hanover Milling Co.* v. *Metcalf,* 240 U. S. 403, 412. The ownership of the good will, we repeat, remains unchanged, notwithstanding the commodity has been parted with. Section 2 of the act does not prevent a purchaser of the commodity bearing the mark from selling the commodity alone at any price he pleases. It interferes only when he sells with the aid of the good will of the vendor; and it interferes then only to protect that good will against injury. It proceeds upon the theory that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes what the statute denominates "unfair competition." See *Liberty Warehouse Co.* v. *Burley Tobacco Growers' Assn.,* 276 U. S. 71, 91–92, 96–97. There is nothing in the act to preclude the purchaser from removing the mark or brand from the commodity—thus separating the physical property, which he owns, from the good will, which is the property of another—and then selling the commodity at his own price, provided he can do so without utilizing the good will of the latter as an aid to that end.

There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the good will and business of the producer and distributor of identified goods, but injurious to the general public as well. The evidence to that effect is voluminous; but it would serve no useful purpose to review the evidence or to enlarge further upon the subject. True, there is evidence, opinion and argument to the contrary; but it does not concern us to determine where the

weight lies. We need say no more than that the question may be regarded as fairly open to differences of opinion. The legislation here in question proceeds upon the former and not the latter view; and the legislative determination in that respect, in the circumstances here disclosed, is conclusive so far as this court is concerned. Where the question of what the facts establish is a fairly-debatable one, we accept and carry into effect the opinion of the legislature. *Radice* v. *New York,* 264 U. S. 292, 294; *Zahn* v. *Board of Public Works,* 274 U. S. 325, 328, and cases cited.

Certain terms contained in the act are said to be fatally vague and indefinite, and therefore to deny due process of law under our decisions in *Connally* v. *General Construction Co.,* 269 U. S. 385, 390 *et seq.,* and other cases. The contention is directed in the main against the phrase in § 1 of the act, "fair and open competition," and "any commodity" and "any contract entered into pursuant to the provisions of section 1" contained in § 2. The point is shown to be lacking in substance by the reasoning in the *Connally* case at pp. 391–392 and the cases there cited. See particularly *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497, 501–503; *United States* v. *Cohen Grocery Co.,* 255 U. S. 81, 92, where it is said "that, for reasons found to result either from the text of the statutes involved or the subjects with which they dealt, a standard of some sort was afforded." Certainly, the phrase "fair and open competition" is as definite as the phrase contained in § 5 of the Federal Trade Commission Act, "unfair *methods* of competition," which this court has never regarded as being fatally uncertain. *Federal Trade Comm'n* v. *Gratz,* 253 U. S. 421, 427; *Federal Trade Comm'n* v. *Beech-Nut Co.,* 257 U. S. 441, 453; *Federal Trade Comm'n* v. *Raladam Co.,* 283 U. S. 643, 648. We think the phrases complained of are sufficiently definite, considering the whole statute; and that no one need be misled as to their meaning, or need suffer by reason of

any supposed uncertainty. Cf. *Miller* v. *Schoene,* 276 U. S. 272, 281; *Standard Oil Co.* v. *United States,* 221 U. S. 1, 69.

*Second.* The contention that § 2 of the act denies the equal protection of the laws in violation of the Fourteenth Amendment proceeds upon the view that it confers a privilege upon the producers and owners of goods identified by trade-mark, brand or name, which it denies in the case of unidentified goods. As this court many times has said, the equal-protection clause does not preclude the states from resorting to classification for the purposes of legislation. It only requires that the classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Colgate* v. *Harvey,* 296 U. S. 404, 422, 423, and cases cited.

Clearly, the challenged section of the Illinois act satisfies this test. Enough appears already in this opinion to show the essential difference between trade-marked goods and others not so identified. The entire struggle to bring about legislation such as the Illinois act embodies has been based upon this essential difference. In *Radice* v. *New York,* 264 U. S. 292, 296–297, we sustained a statute prohibiting night employment of women in restaurants in large cities, against the claim that it denied equal protection of the laws in that it did not apply to small cities, or to women employed as singers and performers, or to attendants in ladies' cloak rooms and parlors, or employees in hotel dining rooms and kitchens or in lunch rooms and restaurants conducted by employers for the benefit of their employees. Former decisions of the court were cited sustaining classifications based upon differences between fire insurance and other kinds of insurance; between railroads and other corporations; between barber-shop employment and other kinds of labor; between

"immigrant agents" engaged in hiring laborers to be employed beyond the limits of a state and persons engaged in the business of hiring for labor within the state; between sugar refiners who produce the sugar and those who purchase it. Other illustrations of a similar character might be cited.

But it is unnecessary to pursue the subject further; for, since the sole purpose of the present law is to afford a legitimate remedy for an injury to the good will which results from the use of trade-marks, brands or names, it is obvious that its provisions would be wholly inapplicable to goods which are unmarked.

*Decrees affirmed.*

MR. JUSTICE STONE took no part in the consideration or decision of these cases.