The **ESTERBROOK PEN COMPANY,** Plaintiff,

v.

**SAN JUAN F. VILARINO 5 Y 10, Inc. and 5 & 10 Vilarino, Inc.,** Defendants.

Civ. No. 9185.

United States District Court D. Puerto Rico, San Juan Division. Sept. 10, 1956.

C. R. Hartzell, R. O. Fernandez, V. M. Ydrach, Jaime Pieras, Jr., P. Juvenal

Rosa and Jose L. Novas, San Juan, P. R., for plaintiff.

F. Ponsa Feliu, San Juan, P. R., for defendants.

RUIZ-NAZARIO, District Judge.

## I

This is an action by plaintiff Esterbrook Pen Company of Camden, New Jersey to restrain "San Juan Vilarino Inc." and "5 & 10 Vilarino Inc." from selling Esterbrook pens at less than the so-called Fair Trade price established by plaintiff in certain Retailer Fair Trade Agreements with retailers other than defendants in Puerto Rico.

The pertinent provisions of the Fair Trade Act of Puerto Rico, Tit. 10, Secs. 281–284 L.P.R.A., read as follows:

"§ 282.—Contracts for Sale or Resale of Certain Products. Contracts relative to the sale or resale of any product the object of commerce in Puerto Rico, the label or container of which shows the trademark, standard of quality or name of the producer or owner of such article, and which may be in competition with articles of a similar kind produced by others, can contain the following stipulations:

(1) That the purchaser shall not resell such product except at a minimum price stipulated by the vendor;

(2)     *     *     *     *     *"

"§ 283.—Unfair Competition; Damages. Every person or firm knowingly and wilfully advertising or offering for sale or selling any article of commerce at a price lower than that stipulated in a contract executed in accordance with the provisions of the preceding section 282 of this title, even though the person who so advertises, offers, or sells is or is not an interested party to said contract, shall be considered as being guilty of unfair competition and shall be liable in an action for damages; and if the case is decided in favor of the claimant, the court shall determine the amount of the indemnity to which he is entitled.—May 15, 1937, No. 147, p. 388, § 3, eff. 90 days after May 15, 1937".

There is no question that defendants were underselling Esterbrook pens, which are trademarked under the laws of Puerto Rico, nor that the pens manufactured by plaintiff are in competition with articles of a similar kind produced by others. Esterbrook has been manufacturing articles for writing, drawing and lettering for some 97 years and the name Esterbrook has become well known in the United States and Puerto Rico and is an asset that, with the good will it has earned is worth well over the $3,000 amount in controversy necessary to give this court jurisdiction.

Defendants in their answer admit that they have knowledge of the Fair Trade Agreements executed between plaintiff and retailers in Puerto Rico, and admit underselling Esterbrook pens. They contend, however, that other retailers in Puerto Rico have sold in the past and were selling up to and during the trial of the action, Esterbrook pens at less than the minimum prices established in plaintiff's Fair Trade Agreements; that plaintiff knew of these violations by the nonsigners, and acquiesced in them; that there is as a result of these sales by other retailers, no stable market for Esterbrook pens. In addition defendant alleges improper discrimination by plaintiff against defendants, and contends that the Fair Trade Act of Puerto Rico is unconstitutional and inconsistent with the public policy of the Commonwealth regarding stabilization of prices, as that policy is expressed in Act 228 of May 12, 1942, and Act 97 of June 19, 1953.

## II

During the course of the trial defendant introduced some 28 Esterbrook pens which had been sold at less than the Fair Trade Agreement price, both by signers and nonsigners. This evidence at first sight does seem to disclose a rather chaotic situation in the Esterbrook pen market in Puerto Rico, and tends to show

lack of enforcement on the part of plaintiff, if not acquiescence to violations of its retail agreement.

██ However, an analysis of these sales shows that they are hardly sufficient to defeat enforcement in this action of the public policy of the Commonwealth respecting retail sales of trademarked articles, as that policy is announced in the Fair Trade Act, Tit. 10, Secs. 281–284, L.P.R.A. They are isolated sales, and there is nothing in the evidence showing that any of the dealers involved consistently undersold Esterbrooks in such a manner as to make the plaintiff chargeable with knowledge, and, as a consequence of inaction, acquiescence. Surely the owner of a trademark is authorized in the face of several violations, to decide against whom he will proceed first—all things must have a beginning—and when he proceeds first against the most flagrant and open violator of them all, it is no defense to point out 28 single purchases from others and contend that there is no stable market. Defendant has admitted that he advertised these pens for sale at less than the retail price fixed by the Fair Trade Agreements. It is precisely defendants, of all the retailers, who must be stopped from continuing their advertising and underselling of pens—no schedule of prices could be enforced unless these defendants, who flagrantly advertise their violation of Tit. 10, Secs. 281–284, L.P. R.A., are curbed. See Sunbeam Corporation v. Marcus, D.C., 105 F.Supp. 39.

██ Defendants complain that they are discriminated against in that Esterbrook gives a 50% discount on wholesalers who are also retailers. There is nothing in the Fair Trade Act forbidding such a discount. Manufacturers and those purchasing from them for resale have the right to reach any arrangement satisfactory to both parties.

In Burroughs Wellcome & Co. v. Johnson Wholesale Perfume Company, 128 Conn. 596, 24 A.2d 841, at page 843 the court said:

"The price at which the plaintiff sells to all wholesalers, including those which sell at retail in connection with their wholesale business, is the list price less 33⅓, 15 and 5% * * *. The sale of the plaintiff's products [drugs, medical and toilet products] is not charged with a public use and benefit. * * * *"

and at page 845 of 24 A.2d:

"The intent of the act is to enable a producer or distributor of an article within its purview to fix the minimum price at which the article shall be sold to consumers and it does not purport to determine the terms upon which the producer or distributor may sell the article to those who ultimately dispose of it to the consumer, but that is left open to free bargaining between the producer or distributor and those who purchase from it or its wholesalers. The plaintiff gave the discounts from its list prices allowed to wholesalers to wholesalers who sold also at retail, but this is not forbidden by the act nor otherwise illegal."

### III

██ Defendants contend that the Fair Trade Act is unconstitutional relying on its nonsigner provisions. In Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 299 U.S. 183 at page 193, 57 S.Ct. 139, at page 144, 81 L.Ed. 109, the Supreme Court, in deciding a case arising under the Illinois Fair Trade Act (from which the Puerto Rico Act was obviously copied) stated as follows:

"The challenge is directed against section 2 (Smith-Hurd Ill.Stats. c. 121½, § 189), which provides that wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract made under section 1, whether the person doing so is or is not a party to the contract, shall constitute unfair competition, giving rise to a right of action in favor of anyone damaged thereby.

"It is first to be observed that section 2 reaches not the *mere advertising,* offering for sale, or selling at less than the stipulated price, but the doing of any of these things *willfully* and *knowingly.* We are not called upon to determine the case of one who has made his purchase in ignorance of the contractual restriction upon the selling price, but of a purchaser who has had definite information respecting such contractual restriction and who, with such knowledge, nevertheless proceeds willfully to resell in disregard of it.

"In the second place, section 2 does not deal with the restriction upon the sale of the commodity *qua* commodity, but with that restriction because the commodity is identified by the trade-mark, brand, or name of the producer or owner. The essence of the statutory violation then consists not in the bare disposition of the commodity, but in a forbidden use of the trade-mark, brand, or name in accomplishing such disposition. The primary aim of the law is to protect the property— namely, the good will—of the producer, which he still owns. The price restriction is adopted as an appropriate means to that perfectly legitimate end, and not as an end in itself.

"Appellants here acquired the commodity in question with full knowledge of the then existing restriction in respect of price which the producer and wholesale dealer had imposed, and, of course, with presumptive if not actual knowledge of the law which authorized the restriction. Appellants were not obliged to buy; and their voluntary acquisition of the property with such knowledge carried with it, upon every principle of fair dealing, assent to the protective restriction, with consequent liability under section 2 of the law by which such acquisition was conditioned. [Citing cases.]

"We find nothing in this situation to justify the contention that there is an unlawful delegation of power to private persons to control the disposition of the property of others, such as was condemned in Eubank v. Richmond, 226 U.S. 137, 143, 33 S.Ct. 76, 57 L.Ed. 156; State of Washington ex rel. Seattle Trust Co. v. Roberge, 278 U.S. 116, 121, 122, 49 S.Ct. 50, 51, 52, 73 L.Ed. 210; and Carter v. Carter Coal Co., 298 U.S. 238, 311, 56 S.Ct. 855, 872, 873, 80 L.Ed. 1160. In those cases the property affected had been acquired without any preexisting restriction in respect of its use or disposition. The imposition of the restriction *in invitum* was authorized after complete and unrestricted ownership had vested in the persons affected. Here, the restriction, already imposed with the knowledge of appellants, ran with the acquisition and conditioned it.

"Nor is section 2 so arbitrary, unfair or wanting in reason as to result in a denial of due process. We are here dealing not with a commodity alone, but with a commodity plus the brand or trade-mark which it bears as evidence of its origin and of the quality of the commodity for which the brand or trade-mark stands. Appellants own the commodity; they do not own the mark or the good will that the mark symbolizes. And good will is property in a very real sense, injury to which, like injury to any other species of property, is a proper subject for legislation. Good will is a valuable contributing aid to business—sometimes the most valuable contributing asset of the producer or distributor of commodities. And distinctive trade-marks, labels and brands, are legitimate aids to the creation or enlargement of such good will. It is well settled that the proprietor of the good will 'is entitled to protection as against one who attempts to deprive him of the benefits re-

sulting from the same, by using his labels and trade-mark without his consent and authority.' McLean v. Fleming, 96 U.S. 245, 252, 24 L.Ed. 828. 'Courts afford redress or relief upon the ground that a party has a valuable interest in the good will of his trade or business, and in the trademarks adopted to maintain and extend it.' Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 412, 36 S.Ct. 357, 360, 60 L.Ed. 713. The ownership of the good will, we repeat, remains unchanged, notwithstanding the commodity has been parted with. Section 2 of the act does not prevent a purchaser of the commodity bearing the mark from selling the commodity alone at any price he pleases. It interferes only when he sells with the aid of the good will of the vendor; and it interferes then only to protect that good will against injury. It proceeds upon the theory that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes what the statute denominates 'unfair competition.' See Liberty Warehouse Co. v. Burley Tobacco Growers' Ass'n, 276 U.S. 71, 91, 92, 96, 97, 48 S.Ct. 291, 295, 296, 297, 72 L.Ed. 473. There is nothing in the act to preclude the purchaser from removing the mark or brand from the commodity—thus separating the physical property, which he owns, from the good will, which is the property of another—and then selling the commodity at his own price, provided he can do so without utilizing the good will of the latter as an aid to that end.

"There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the good will and business of the producer and distributor of identified goods, but injurious to the general public as well. The evidence to that effect is volumi-nous; but it would serve no useful purpose to review the evidence or to enlarge further upon the subject. True there is evidence, opinion and argument to the contrary; but it does not concern us to determine where the weight lies. We need say no more than that the question may be regarded as fairly open to differences of opinion. The legislation here in question proceeds upon the former and not the latter view; and the legislative determination in that respect, in the circumstances here disclosed, is conclusive so far as this court is concerned. Where the question of what the facts establish is a fairly-debatable one, we accept and carry into effect the opinion of the Legislature. Radice v. New York, 264 U.S. 292, 294, 44 S.Ct. 325, 326, 68 L.Ed. 690; Zahn v. Board of Public Works, 274 U.S. 325, 328, 47 S.Ct. 594, 595, 71 L.Ed. 1074, and cases cited."

In the light of the old Dearborn Case, I would be wholly unjustified in holding the Puerto Rico Fair Trade Act unconstitutional, in the absence of any such ruling by the Supreme Court of Puerto Rico. See Lee Wilson Inc. v. General Electric Co., 1 Cir., 222 F.2d 850.

As fountain pens are not basic commodities there is no inconsistency between the Fair Trade Act and Acts No. 228 of May 12, 1942 and Act No. 97 of June 19, 1953.

■ A preliminary injunction will be entered against both defendants enjoining and restraining them and their agents and representatives from advertising, offering for sale or selling Esterbrook products at prices lower than those specified by the plaintiff in its minimum consumer quantity price list. However, the order will provide that defendant may at any time apply for a dissolution of the injunction on the ground that plaintiff is not in good faith maintaining its established prices, and if this is then

proved to the satisfaction of the court, such dissolution will be granted.

The parties are granted a period of ten days within which to file proposed findings of fact and conclusions of law.