JOHNSON & JOHNSON, INC., A NEW JERSEY CORPO-
RATION *v.* G. E. M. SUNDRIES COMPANY, INC., A
NEVADA CORPORATION.

No. 4055.

Argued November 20, 1958.          Decided January 16, 1959.

Rice, C. J., Stainback and Marumoto, JJ.

104

OPINION OF THE COURT BY STAINBACK, J.

This action was brought under the provisions of the Hawaii Fair Trade Act (chapter 205, Revised Laws of Hawaii 1955) to enjoin the defendant-corporation from selling the products of appellant at less than the fair-trade price fixed by appellant.

The complaint alleges that the appellant is a New Jersey corporation transacting business in the Territory of Hawaii, while appellee is a Nevada corporation also transacting business in the Territory; that the appellant produces various products sold bearing its registered trade-mark and all such products are sold in containers bearing the name of the producer and are in fair and open

competition with commodities of the same general class produced by others; that appellant entered into contracts with various retailers in the City and County of Honolulu who agreed not to sell appellant's products at less than specified minimum price at retail as fixed by appellant from time to time; that the appellee had notice of the existence of the fair-trade contracts but despite such notice sold appellant's products at less than the fair-trade price fixed by such contracts and, unless restrained, will continue to do so; that the continuance of such sales would do irreparable damage to appellant in its business, and appellant has no speedy and adequate remedy at law.

All the facts alleged in the complaint were stipulated to or found by the court to be true.

Appellee made a motion to dismiss upon the following points: (1) the complaint fails to state a cause of action against defendant that would entitle it to any relief; (2) the Hawaii Fair Trade Act was illegal at the time of its enactment for the reason that it was in violation of Sections 1 and 3 of the Sherman Act; (3) assuming the power of the legislature of the Territory of Hawaii to enact such a fair-trade act, following the amendment to Section 1 of the Sherman Act by the Miller-Tydings Act no such reenactment has been accomplished; (4) the Hawaii Fair Trade Act, and more particularly the so-called "nonsigner" provision thereof, is unconstitutional for the reason that the same is a price-fixing statute and the legislature is without power to fix prices at which commodities may be sold unless the business or property involved is affected with a public interest; (5) assuming the power of the legislature to fix prices and its authority to delegate that power, any such delegation to be valid must provide a primary standard or general rule to be followed in discharging the delegated power, and the Hawaii Fair Trade Act provides no such standard or rule; (6) the Hawaii Fair Trade Act is unconstitutional because it interferes with the right of the seller and the purchaser to freely contract and agree upon a price of their choice, and that this right to contract is a property right protected by the Fifth and Fourteenth Amendments to the Constitution of the United States; (7) the Hawaii Fair Trade Act is void as an invalid exercise of a police power, being an attempt to use that power for a private and not a

public purpose; (8) the Hawaii Fair Trade Act is invalid and inoperative in so far as it purports to authorize the enforcement of minimum fair-trade resale prices against any person who is not a party to the contract by which the minimum resale prices were established.

The court below found the Hawaii Fair Trade Act was contrary to Section 3 of the Sherman Antitrust Act, that neither the Miller-Tydings amendment nor the McGuire Act validated the Hawaii Fair Trade Act nor provided any authority for the enactment of such an Act in the future. It also found the Hawaii Fair Trade Act makes only those contracts in privity enforceable and refused to enjoin the defendant from selling at less than the fair-trade price fixed by the holder of the registered trade-mark.

The case comes to this court upon appeal from the order dismissing the complaint.

The case presents to this court the questions of (1) whether Section 3 of the Sherman Act invalidates the Hawaii Fair Trade Act and (2) whether enforcement of the Hawaii Fair Trade Act depends upon privity of contract.

The case of *Auto Rental Co.* v. *Lee,* 35 Haw. 77, held that the Fair Trade Act is a rightful subject of legislation within the provisions of Section 55 of the Organic Act; that there is no inconsistency between the provisions of the Fair Trade Act and the provisions of the Sherman Antitrust Act, as amended; that the provisions of the Fair Trade Act are not contrary to the due-process clause of the Constitution of the United States; and that there need be no privity of contract between the owner of the trade-marked brand or name and the dealer, but that the Act binds all noncontract dealers who have knowledge of the terms of the subsisting contract in the trade-marked commodity. The latter may possibly be dictum; however, the point was well reasoned and considered by the court in making its decision. Thus, *Auto Rental Co.* v. *Lee, supra,* appears conclusive of this case unless we desire to overrule it.

As was noted in the case of *Auto Rental Co.* v. *Lee, supra,* the enforcement of the Fair Trade Act is an exercise of the *police power* of the Territory for "giving protection to trade mark owners, producers and the general public, against injurious and uneco-

nomic practices in the distribution of certain commodities." (*Auto Rental Co.* v. *Lee,* 35 Haw. 77, 84, citing *Triner Corporation* v. *McNeil,* 363 Ill. 559, 2 N. E. [2d] 929.) It is not an action to enforce a contract between the parties thereto.

The Fair Trade Act is calculated to prevent price cutting upon the sale of trade-marked articles sold in competition with articles of a similar class, the minimum sale price of which has been established by the producer or distributor. Unfair competition, as defined in the Act, consists "not in the bare disposition of the commodity, but in a forbidden use of the trade-mark, brand or name in accomplishing such disposition." (*Old Dearborn Co.* v. *Seagram Corp.,* 299 U. S. 183, 193.)

Protecting patents and trade-marks, etc., for economic benefit is a rightful subject of legislation within the meaning of that term as employed in Section 55 of the Organic Act. It is an exercise of the police power. (*Auto Rental Co.* v. *Lee, supra.*) It is not the court's duty to pass upon the soundness of the economic theory upon which such Acts are passed, as that is a matter of public policy for the legislature. However, the economic theory is clearly not so unreasonable as to cause any interference by the courts.

*Old Dearborn Co.* v. *Seagram Corp.,* 299 U. S. 183, at 195-196, states:

"There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the good will and business of the producer and distributor of identified goods, but injurious to the general public as well. The evidence to that effect is voluminous; but it would serve no useful purpose to review the evidence or to enlarge further upon the subject. True, there is evidence, opinion and argument to the contrary; but it does not concern us to determine where the weight lies. We need say no more than that the question may be regarded as fairly open to differences of opinion. The legislation here in question proceeds upon the former and not the latter view; and the legislative determination in that respect, in the circumstances here disclosed, is conclusive so far as this court is concerned. Where the question of what the facts establish is a fairly-debatable one, we accept and carry into effect the opin-

· ion of the legislature. *Radice* v. *New York,* 264 U. S. 292, 294; *Zahn* v. *Board of Public Works,* 274 U. S. 325, 328, and cases · cited."

A justification of the economic theory of the Fair Trade Act is well set forth by Mr. Justice Brandeis, famous as an economist as well as a lawyer, in an article published in Harper's Weekly (November 15, 1913), from which the following is an excerpt:

"* * * when a dealer has to use somebody else's name or brand in order to sell goods, then the owner of that name or brand has an interest which should be respected. The transaction is essentially one between the two principals—the maker and the user. All others are middlemen or agents; for the product is not really sold until it has been bought by the consumer. Why should one middleman have the power to depreciate in the public mind the value of the maker's brand and render it unprofitable not only for the maker but for other middlemen? Why should one middleman be allowed to indulge in a practice of price-cutting, which tends to drive the maker's goods out of the market and in the end interferes with people getting the goods at all?

"When a trade-marked article is advertised to be sold at less than the standard price, it is generally done to attract persons to a particular store by the offer of an obviously extraordinary bargain. It is a bait—called by the dealers a 'leader.' But the cut-price article would more appropriately be termed a 'misleader'; because ordinarily the very purpose of the cut-price is to create a false impression." (The Social and Economic Views of Mr. Justice Brandeis, pp. 405, 406.)

The territorial legislature has, except as restricted by congressional act, the power of a state legislature. Section 55 of the Organic Act provides:

"That the legislative power of the Territory shall extend to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States locally applicable."

Since the organization of the Territory of Wisconsin in 1836 the several Territories in the United States have been granted powers of local self-government under provisions that do not differ substantially from Section 55 of our own Organic Act. (*Maynard v. Hill*, 125 U. S. 190.) Let us, therefore, examine some of the decisions to see what, under this provision, are "rightful subjects of legislation not inconsistent with the Constitution and laws of the United States locally applicable."

Under a similar provision for the Territory of Utah, the Supreme Court of the United States in *Clinton et al.* v. *Englebrecht*, 80 U. S. 434, under the Organic-Act provision that "The legislative power of said Territory shall extend to all rightful subjects of legislation, consistent with the Constitution of the United States, and the provisions of this act" the court, in holding that the mode of procuring jurors is a "rightful subject of legislation," stated:

"The theory upon which the various governments for portions of the territory of the United States have been organized, has ever been that of leaving to the inhabitants all the powers of self-government consistent with the supremacy and supervision of National authority, and with certain fundamental principles established by Congress."

Under a similar provision of the Organic Act of the Territory of Montana, the United States Supreme Court in *Hornbuckle* v. *Toombs*, 85 U. S. 648, 655, held that the practice, pleadings, forms and modes of proceedings of the territorial courts were intended by Congress to be left to the legislative action of territorial assemblies, stating:

"The powers thus exercised by the Territorial legislatures are nearly as extensive as those exercised by any State legislature; and the jurisdiction of the Territorial courts is collectively co-extensive with and correspondent to that of the State courts. * * *"

In *Cope* v. *Cope*, 137 U. S. 682, 684, under a Utah territorial statute making "illegitimate children and their mothers inherit in like manner from the father, whether acknowledged by him or

not, provided it shall be made to appear to the satisfaction of the court that he was the father of such illegitimate child or children," it was held that the child of the polygamous or plural wife inherited from his father in spite of the Act of Congress forbidding polygamy in the Territory. The court said, among other things:

"* * * *the power of the Territorial legislature was apparently as plenary as that of the legislature of a State. Maynard* v. *Hill*, 125 U. S. 190, 204. The distribution of and the right of succession to the estates of deceased persons are matters exclusively of State cognizance, and are such as were within the competence of the Territorial legislature to deal with as it saw fit, in the absence of an inhibition by Congress." (Emphasis added.)

Finally, the case of *Puerto Rico* v. *Shell Co.,* 302 U. S. 253, 261, in upholding the adoption by the legislature of Puerto Rico of a local Antitrust Act very similar to the Sherman Act (although Puerto Rico as a Territory came under the provisions of the Sherman Antitrust Act) states:

"The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination, with an autonomy similar to that of the states and incorporated territories."

In view of the foregoing examples of what are "rightful subjects of legislation" under this provision of the Organic Act, let us quote the definition as given in *Maynard* v. *Hill, supra.* This case stated the question of rightful subjects of legislation "is not to be settled by reference to the distinctions usually made between legislative acts and such as are judicial or administrative in their character, but by an examination of the subjects upon which legislatures had been in the practice of acting with the consent and approval of the people they represented."

Inasmuch as the legislatures of 46 States and of 2 Territories have passed Fair Trade Acts, it cannot be questioned that Fair Trade Acts are "rightful subjects of legislation."

The next question is whether the Hawaii Fair Trade Act is contrary to the Constitution or laws of the United States.

The contentions are made that the Hawaii Fair Trade Act conflicts with the Sherman Antitrust Act and is therefore invalid and, further, assuming that the Hawaii Fair Trade Act is valid, it requires privity of contract between the owner of the registered trademark and the retailer who sells the same.

The first would be true under the Sherman Antitrust Act prior to the Miller-Tydings Act and the McGuire Act amending the same. In 1911 the Supreme Court of the United States held in *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373, that resale price maintenance in interstate commerce conflicted with the Sherman Antitrust Act. However, in 1937 Congress passed the Miller-Tydings Act which was intended to permit the States and Territories to legalize the fair-trade statutes then existing in States and Territories or thereafter be passed to exempt such price maintenance from the provisions of the Sherman Antitrust Act.

However, the plan of Congress was partly upset when a divided Supreme Court in interpreting the amendment held that the Act did modify the Federal antitrust law with respect to actual signers of fair-trade contracts but not with respect to fair-trade rights against nonsigners. In delivering the opinion of the court, Mr. Justice Douglas stated that had the Congress desired to eliminate this provision, "different measures would have been adopted— either a nonsigner provision would have been included or resale price fixing would have been authorized without more." (*Schwegmann Bros.* v. *Calvert Corp.,* 341 U. S. 384, 390.) Thereafter, to correct this interpretation by the Supreme Court, the Congress enacted the McGuire Act, which specifically covers nonsigners. Sections 2 and 3 of the McGuire Act are as follows:

"(2) Nothing contained in this Act or in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing minimum or stipulated prices, or requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices, for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts

or agreements of that description are lawful as applied to intra-state transactions *under any statute, law, or public policy now or hereafter in effect in any State, Territory,* or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale.

"(3) Nothing contained in this Act or in any of the Anti-trust Acts shall render unlawful the exercise or the enforcement of any right or right of action created by any *statute, law, or public policy* now or hereafter in effect in any State, *Territory,* or the District of Columbia, which in substance provides that wilfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements *whether the person so advertising, offering for sale, or selling is or is not a party to such a contract or agreement, is unfair competition and is actionable at the suit of any person damaged thereby."* (Emphasis added.)

The court below in finding that "neither the amendment of 1937 [Miller-Tydings Act] nor the amendment of 1952 [McGuire Act] amended Section 3 of the Sherman Act" disregarded the express wording of the statutes, basing its opinion upon the fact that since the preamble of the statute mentioned only States, the Act did not apply to Territories although the terms "any State, Territory, or the District of Columbia" were specially named in the Act.

While the constitutions of many States, and our own Organic Act by Section 45, provide that each law shall embrace but one subject which shall be expressed in its title, there is no such restriction upon the Congress; time and time again so-called riders have been attached to Acts of Congress and the legality of such procedure is beyond question.

"Originally in England, bills were not given titles. Even when used, titles were not considered part of an act. Although a similar view was also followed in early American legislative history, the custom gradually developed to affix captions to legislative acts to identify the subject matter of the legislation. Eventually, the draftsmen of state constitutions inserted provisions in their documents, the effect of which was to require titles on all statutes. The federal constitution does not impose any limitation on

the use of titles." (1 Sutherland, *Statutory Construction,* 3d ed., *Titles,* § 1701, pp. 283-284.)

In *Hadden* v. *The Collector,* 72 U. S. 107, a portion of the syllabus reads:

"The title of an act cannot be used to extend or to restrain any positive provisions contained in the body of the act. It is only when the meaning of these is doubtful that resort may be had to the title, and even then it has little weight."

The court stated on page 110:

"The title of an act furnishes little aid in the construction of its provisions. Originally in the English courts the title was held to be no part of the act;—'no more,' says Lord Holt, 'than the title of a book is part of the book.' It was generally framed by the clerk of the House of Parliament, where the Act originated, and was intended only as a means of convenient reference. At the present day the title constitutes a part of the act, but it is still considered as only a formal part; it cannot be used to extend or to restrain any positive provisions contained in the body of the act. It is only when the meaning of these is doubtful that resort may be had to the title, and even then it has little weight. It is seldom the subject of special consideration by the legislature.

"These observations apply with special force to acts of Congress. Every one who has had occasion to examine them has found the most incongruous provisions, having no reference to the matter specified in the title."

The court then points out a number of incongruous provisions such as a rider to an appropriation Act which contained the provision that no witness should be excluded in the courts of the United States on account of color, etc., a law regulating appeals in Mexican land cases which contained a rider making appropriations for civil and diplomatic expenses of the government for the year 1853, etc.

Further, while the words "State," "States," or "United States," as used in the Constitution or the laws of Congress, usually apply

only to States and not Territories (*Downes* v. *Bidwell,* 182 U. S. 244, at pages 250-251, 257, 259; *Alaska* v. *Troy,* 258 U. S. 101), yet the words "State," "States," or "United States," where the context so shows, may be construed in the broader meaning as including any separate political community such as a Territory. (*Wynne* v. *United States,* 217 U. S. 234, citing numerous cases.)

*Ex Parte Reggel,* 114 U. S. 642, 650, and *Kopel* v. *Bingham,* 211 U. S. 468, extradition cases, hold that the provisions of Section 2 of Article IV of the Constitution, providing that a person charged with crime in any State who shall flee from justice and be found in another State, shall on demand of executive authority of the State from which he has fled be delivered up to be removed to the State having jurisdiction of the crime, applies to one who flees from Puerto Rico to a State.

"In many contexts 'state' may mean only the several states of the United States. Here, however, we hold that its meaning includes the Territory of Hawaii." (*Andres* v. *United States,* 333 U. S. 740, 745.)

The claim is made that the Hawaii Fair Trade Act being invalid when passed was not validated by the passage of the Miller-Tydings and the McGuire Acts or by the reenactment of the Fair Trade Act in the Revised Laws of Hawaii of 1945 and of 1955.

It will be noted that the amendment to the Sherman Antitrust Act is intended to legalize "any statute, law or public policy now or hereafter in effect in any State, Territory or the District of Columbia," thus expressly legalizing existing laws of the States or Territories which were not enforceable because of conflict with the Sherman Antitrust Act. The vast majority of decisions from the various States has held that reenactment of the fair-trade statutes was not necessary to make such statutes valid, although there is authority to the contrary.

In *In Re Rahrer,* 140 U. S. 545, 565, the Supreme Court of the United States held:

"This is not the case of a law enacted in the unauthorized exercise of a power exclusively confided to Congress, but of a law which it was competent for the State to pass, but which

could not operate upon articles occupying a certain situation until the passage of the act of Congress. That act in terms removed the obstacle, and we perceive no adequate ground for adjudging that a reenactment of the state law was required before it could have the effect upon imported which it had always had upon domestic property."

Similarly, in *Central Pacific Railroad* v. *Nevada*, 162 U. S. 512, 523 (1896), the statement is made:

"No action on the part of the State or its legislature was necessary to signify its acceptance of the authority conferred by the Federal statute. * * *

"Nor, conceding that the General Statutes of Nevada were inoperative to authorize the taxation of these lands prior to the act of Congress of July, 1886, was any reenactment of those statutes necessary, since the effect of this act was merely to remove the only obstacle to their enforcement."

To the contrary is *Grayson-Robinson Stores, Inc.* v. *Oneida, Ltd.*, 209 Ga. 613, 75 S.E. (2d) 161, which held that a void statute can be made effective only by reenactment. However, see 25 Haw. 638, 640-642.

The decision of the lower court that the enforcement of rights against unfair competition depends upon privity of contract is without merit and contrary to *Old Dearborn Co.* v. *Seagram Corp.*, 299 U. S. 183, sustaining the Illinois Fair Trade Act, and *Pep Boys* v. *Pyroil Sales Co.*, 299 U. S. 198, sustaining the California Fair Trade Act, and our own Supreme Court decision in *Auto Rental Co.* v. *Lee, supra*. These opinions are sweeping and passed upon all the contentions raised by the defendant, the appellee in this case. Price restriction is binding upon a dealer who has full knowledge of an existing price restriction imposed by contract between a producer and other retailers, does not violate the due-process clause of the Fourteenth Amendment, and is not an unlawful delegation of the power to private persons to control the disposition of property of others; it is not arbitrary, unfair or unreasonable; the essence of the statutory prohibition is not the mere disposal of the commodity, but for the use of the trade-mark, brand or name in accomplishing such disposition.

While there are a number of decisions holding that there must be privity of contract, the Supreme Court of the United States, the Hawaiian court, and the weight of authority hold that when authorized by the statute no privity of contract is necessary for the owner of a trade-mark to protect himself by fixing the price at which a retailer may sell. To protect the good will and copyright of the producer, privity of contract is not necessary. The only requirement is that the retailer have knowledge of the restriction on the sales price.

We deem it unnecessary to review at length the many decisions upholding the constitutionality of Fair Trade Acts as to nonsigners and those holding to the contrary.

The case of *Esterbrook Pen* v. *San Juan F. Vilarino 5 Y 10,* 144 F. Supp. 309 (1956), is interesting because Puerto Rico, like Hawaii, is a Territory and enacted its own Fair Trade Act.

There are also many decisions turning upon the point whether a defendant-retailer had knowledge of the restrictions imposed by the owner of the trade-mark. (*Lionel Corp.* v. *Grayson-Robinson Stores,* 15 N. J. 191, 104 A. [2d] 304.)

To the contention that because price-cutting sales in the District of Columbia are legal (citing *General Electric Co.* v. *Masters Mail Order Co.,* 244 F. [2d] 681), such sales would be legal in Hawaii, the complete answer of course is that there is no Fair Trade Act in the District of Columbia.

The further contention that it would require Congress to act for Hawaii just as it would for the District of Columbia is fully answered by the fact that the Territory has been given complete freedom of legislation on local matters while the District of Columbia is given no legislative authority on any matters but Congress legislates for it.

While Congress has plenary power over the Territory and might pass specific Acts for its benefit or might exempt the Territory from general Acts as it sees fit and thus could have exempted the Territory from the provisions of the Antitrust Act where the Fair Trade Act is involved, instead by the Miller-Tydings and the Mc-Guire Acts Congress left the Territory in the same position as the various States, that is, the Territory could enact such fair-trade laws or not as it might deem desirable.

See *Christianson* v. *King County*, 239 U. S. 356, 365, where Mr. Justice Hughes, in holding that an escheat law was a proper subject of legislation by the Territory of Washington, stated "the local legislature has generally been entrusted 'with the enactment of the entire system of municipal law' " and continued:

"In the case of the Territories, Congress could have dealt with this subject if it chose, but it did not see fit to establish a rule of its own. The matter, however, remained a 'rightful subject' of legislation and Congress did not except it from the broad grant of legislative power."

If it is desirable for States to have the power to exempt themselves by Fair Trade Acts from antitrust provisions of Federal laws, it is equally desirable for the Territory of Hawaii to have the same power.

The power of the territorial legislature being "as plenary as that of the legislature of a State" (*Cope* v. *Cope, supra*), the Territory has just as much right and power to enact a Fair Trade Act as Illinois or New York or any of the other States whose Fair Trade Acts have been sustained by the Supreme Court of the United States.

Reversed.

*Frank D. Padgett* (*Robertson, Castle & Anthony* with him on the briefs) for appellant.

*Robert G. Dodge* (*Heen, Kai, Dodge & Lum* on the briefs) for appellee.

*Stanley A. Weigel* (*Landels, Weigel & Ripley* and *Pratt, Tavares & Cassidy* with him on the brief) for Parker Pen Company as amici curiae. (*Roy A. Vitousek, Jr.,* present but did not argue.)